### UNITED STATES, Plaintiff,

v.

### Patrick NICOLOSI, Defendant.

#### No. 94cr0775.

United States District Court,
E.D. New York.

May 3, 1995.

---

Demitri M. Jones, Asst. U.S. Atty., Brooklyn, NY, for plaintiff.

Todd D. Greenberg, Addabbo & Greenberg, Forest Hills, NY, for defendant.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

### BACKGROUND

Defendant Patrick Nicolosi was indicted by a federal grand jury. He is charged with sending threatening communications through the U.S. mails in violation of 18 U.S.C. § 876. On April 5, 1995 the Government obtained a "so ordered" subpoena from this court directing the defendant to provide samples of his saliva. On April 7, 1995, defendant moved to quash the subpoena on the grounds that the Government must first obtain a search warrant to conform to the requirements of the Fourth Amendment to the United States Constitution. The issue before this court is whether the Fourth Amendment's principles which regulate governmental searches and seizures apply to the ability of the Government to obtain a saliva sample.[1]

### DISCUSSION

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation ...

Supreme Court "precedents teach that where, as here, the Government seeks to obtain physical evidence from a person, the Fourth Amendment may be relevant at several levels. *See, e.g., United States v. Dionisio*, 410 U.S. 1, 8 [93 S.Ct. 764, 769, 35

---

1. In its letter dated April 14, 1995 in response to defendant's motion, the Government contends that Nicolosi "has already been afforded the protection [of the] ... Fourth Amendment ... with regard to probable cause." The Government finds this "protection" in the fact that "a finding of probable cause has previously been made in this case by a grand jury that returned an indictment against the defendant." Surely, this is incorrect. This logic would suggest that once an indictment is returned the Government need not obtain any further warrants in the case and may inspect the accused's home and wiretap his telephone without any further proceedings.

L.Ed.2d 67] (1973). The initial detention necessary to procure the evidence may be a seizure of the person, *Cupp v. Murphy,* 412 U.S. 291, 294–295 [93 S.Ct. 2000, 2003, 36 L.Ed.2d 900] (1973); *Davis v. Mississippi,* 394 U.S. 721, 726–727, 89 S.Ct. 1394, 1397, 22 L.Ed.2d 676 (1969), if the detention amounts to a meaningful interference with his freedom of movement. *INS v. Delgado,* 466 U.S. 210, 215 [104 S.Ct. 1758, 1762, 80 L.Ed.2d 247] (1984) . . . Obtaining and examining the evidence may also be a search, *see Cupp v. Murphy, supra,* at 295 [93 S.Ct. at 2003] . . . if doing so infringes an expectation of privacy that society is prepared to recognize as reasonable, *see, e.g., California v. Greenwood,* 486 U.S. 35, 43 [108 S.Ct. 1625, 1630, 100 L.Ed.2d 30] (1988) . . ." *Skinner v. Railway Labor Executives' Assn.,* 489 U.S. 602, 616, 109 S.Ct. 1402, 1412, 103 L.Ed.2d 639 (1989) (citations omitted).

■ It should be noted here that Fourth Amendment doctrine contemplates two possible categories of searches: (1) Those that can only be executed pursuant to the issuance of a warrant by a judicial officer, and (2) those that may be permitted without a warrant but must be based upon probable cause to believe that the person to be searched has violated the law, *New Jersey v. T.L.O.,* 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985), or, when the balance of interests precludes insistence upon a showing of probable cause, a showing of "some quantum of individualized suspicion." *See U.S. v. Martinez-Fuerte,* 428 U.S. 543, 560, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116 (1976).

### A

The appropriate precedent with which to begin this discussion is *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).[2] There, the Court addressed the ability of the Government to obtain a blood sample for evidence of intoxication. Schmer-

ber was taken from the scene of an automobile accident to a hospital for treatment. After a police officer smelled alcohol on his breath, Schmerber was placed under arrest for driving while intoxicated. Over his objection, a blood sample was drawn from Schmerber at the direction of the police officer. In appealing his conviction for drunk driving, Schmerber contended, *inter alia,* that the extraction of the blood sample violated his Fourth Amendment rights.

In addressing this contention, the Supreme Court observed that "[t]he overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State." 384 U.S. at 767, 86 S.Ct. at 1834.[3] The Court held that the compulsory administration of blood tests "plainly constitute searches of 'persons'" within the meaning of the Fourth Amendment, and recognized the special sensitivity required with regard to allowing the invasion of a person's body. *Schmerber, Id.,* at 767, 86 S.Ct. at 1834. The Court noted, at 770, 86 S.Ct. at 1835:

> Search warrants are ordinarily required for searches of dwellings, and, absent an emergency, no less could be required where intrusions into the human body are concerned. . . . The importance of informed, detached and deliberate determinations of the issue whether or not to invade another's body in search of evidence is indisputable and great.

The Court went on to conclude that the "special facts" of the case rendered the securing of Schmerber's blood sample without a warrant permissible under Fourth Amendment principles. Those facts were the evanescent nature of the evidence and its being obtained incident to a lawful arrest made upon probable cause. *Id.,* at 770–771, 86 S.Ct. at 1835–1836. After holding that the blood sample was obtainable without a war-

---

**2.** The Court first addressed body searches in *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), and *Breithaupt v. Abram,* 352 U.S. 432, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957), on the basis of the Due Process Clause of the Fourteenth Amendment. These cases came to the Court before the Fourth Amendment was applied to the states by *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

**3.** The Court stated:

> In *Wolf* we recognized "[t]he security of one's privacy against arbitrary intrusion by the police" as being "at the core of the Fourth Amendment" and "basic to a free society." [*Wolf v. Colorado* ] 338 U.S. [25] at 27 [69 S.Ct. 1359, 1361, 93 L.Ed. 1782 (1949) ].

rant, the Court determined that "the test chosen to measure [his] blood alcohol level was a reasonable one" in light of the "commonplace" and "routine" nature of blood test procedures. *Id.*

Thus, as one Court has noted, "the methodology of *Schmerber* for determining whether a particular bodily intrusion was [permissible under the] Fourth Amendment['s] terms is twofold. First, as a threshold requirement for a search and seizure entailing intrusion beneath the skin, the ordinary Fourth Amendment requirements of probable cause and a warrant or an exception, like exigent circumstances justifying a warrantless intrusion, must be satisfied. Second, the particular type of intrusive procedure and the manner in which it is to be performed must be scrutinized for reasonableness." *In re Grand Jury Proceedings,* 816 F.Supp. 1196, 1199 (W.D.Ky.1993).

In *Winston v. Lee,* 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985), the Court was confronted with a case where the bodily intrusion at issue was much more severe. The state sought a court order to conduct surgery upon an arrestee to obtain a bullet lodged in his collarbone. The arrestee contended this would violate his Fourth Amendment rights and the Court took the occasion to elaborate upon the reasonableness aspect of the two-part test. The Court indicated that a proper assessment of reasonableness must balance two factors: First, "[t]he extent to which the procedure may threaten the safety or health of the individual ... [and] the extent of intrusion upon the individual's dignitary interests in personal privacy and bodily integrity." *Id.,* at 761, 105 S.Ct. at 1617. Second, "the community's interest in fairly and accurately determining guilt or innocence." *Id.,* at 762, 105 S.Ct. at 1617–18. While in *Schmerber* this analysis led to the permissibility of the physical intrusion, in *Winston* the Court concluded that since the proposed surgery posed a fair risk to the defendant (permanent injury may have resulted) and

the need for the bullet as a piece of evidence was questionable (the state had sufficient evidence implicating the defendant without the actual bullet), the surgery was an unreasonable method to obtain the evidence sought. *Id.,* at 762, 765, 105 S.Ct. at 1617, 1619.

This two-step analysis along with the *Schmerber* Court's distinction between physical evidence below the skin as opposed to outside the skin have informed the case law regarding the collection of a variety of categories of physical evidence. In *United States v. Dionisio,* 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973), for example, the Court held that a grand jury request for a voice sample did not intrude on defendant's privacy since his voice was "constantly exposed to the public." *Id.,* at 14–15, 93 S.Ct. at 771–72. Similarly, in *United States v. Mara,* 410 U.S. 19, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973), the Court held a handwriting sample could be compelled by a grand jury subpoena for the same reason. *Id.,* at 21, 93 S.Ct. at 775.[4] *See also Davis v. Mississippi,* 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969) (fingerprinting); *In re Grand Jury Proceedings,* 686 F.2d 135, 139 (3rd Cir.1982), *cert. den.,* 459 U.S. 1020, 103 S.Ct. 386, 74 L.Ed.2d 517 (1982) (hair sample).

The treatment of another category of bodily physical evidence which must be considered is urine samples. In such cases, there is no invasion beneath the surface of the skin. Rather, a sample of fluid is voided for analysis. The Supreme Court addressed these tests in *Skinner v. Railway Labor Executives' Assn.,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). There, the Government sought to require the testing of railroad employees' urine samples for traces of drug or alcohol following certain categories of train accidents. The Court did not hesitate to recognize that such testing implicated the Fourth Amendment. The Court found that the regulations were constitutional and that warrants were not required to obtain the samples for reasons specific to the facts of

---

**4.** Both *Dionisio,* at 14, 93 S.Ct. at 771, and *Mara,* at 21, 93 S.Ct. at 775, relied upon the Court's prior reasoning in *Katz v. United States,* 389 U.S.

347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967), that the Fourth Amendment provides no

the case.[5] In the course of its analysis, however, the Court spoke more generally to the issue of such samples and the Fourth Amendment:

> In most criminal cases, we strike [the] balance [between the individual's Fourth Amendment interests and the promotion of legitimate governmental interests] in favor of the procedures described by the Warrant Clause of the Fourth Amendment ... Except in certain well-defined circumstances, a search or seizure in such a case is not reasonable unless it is accomplished pursuant to a judicial warrant issued upon probable cause ...
>
> \* \* \* \* \* \*
>
> An essential purpose of a warrant requirement is to protect privacy interests by assuring citizens subject to a search or seizure that such intrusions are not the random or arbitrary acts of government agents. A warrant assures the citizen that the intrusion is authorized by law, and that it is narrowly limited in its objectives and scope ... A warrant also provides the detached scrutiny of a neutral magistrate, and thus ensures an objective determination whether an intrusion is justified in any given case.

protection for what "a person knowingly exposes to the public, even in his home or office."

5. This conclusion was based upon (1) the regulations being narrowly tailored and affording little discretion to its administrators, (2) the evanescent nature of the evidence, (3) the weight of the governmental interests in reducing railroad accidents, (4) the fact that such prevention was beyond the needs of typical law enforcement, and (5) the fact that railroad employees were involved in an already heavily regulated industry.

   The Court also addressed urine testing in *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). Decided the same day as *Skinner*, *Von Raab* upheld certain aspects of a urine testing program for selected categories of employees of the United States Customs Service.

6. In support of this position the Court wrote:

   "There are few activities in our society more personal or private than the passing of urine. Most people describe it by euphemisms if they talk about it at all. It is a function traditionally performed without public observation; indeed, its performance in public is generally prohibited by law as well as social custom."

*Id.*, at 619, 621–622, 109 S.Ct. at 1415–16 (citations omitted).

It must be noted that the "privacy interests" to which the Court referred were described as the "host of private medical facts about an [individual]" which might be revealed by the chemical analysis of the sample fluid, as well a process of collecting such a sample which may involve visual or aural monitoring of the act of urination. *Skinner*, at 617, 109 S.Ct. at 1413.[6]

Lastly, with regard to another aspect of the proposed railroad employees testing regime, the *Skinner* Court held that "a breathalyzer test, which generally requires the production of alveolar or 'deep lung' breath for chemical analysis ... implicates similar concerns about bodily integrity and, like the blood-alcohol test we considered in *Schmerber*, should also be deemed a search ..." *Id.* (citations omitted).

### B

■ This discussion now turns to the issue at hand; how a saliva sample is to be considered in light of the foregoing legal principles. It appears that this is a new question in the federal courts, if not one of first impression.[7]

*National Treasury Employees Union v. Von Raab*, 816 F.2d 170, 175 ( [5th Cir.]1987). Because it is clear that the collection and testing of urine intrudes upon expectations of privacy that society has long recognized as reasonable, the Federal Courts of Appeals have concluded unanimously, and we agree, that these intrusions must be deemed searches under the Fourth Amendment.
*Id.*, at 617, 109 S.Ct. at 1413 (footnote omitted).

7. In *Henry v. Ryan*, 775 F.Supp. 247 (N.D.Ill. 1991), a case in which blood and saliva samples were sought via a grand jury subpoena, the court assumed that saliva was to be treated as blood under the *Schmerber* analysis. The court stated:

   While no court has explicitly found that a saliva sample is a Fourth Amendment search, extracting a saliva sample seems to involve the same sort of intrusion that goes beyond the physical characteristics exposed to the public and into the security of the person ... For instance, in [this] case a pad was stuck in his mouth to take the saliva sample.
   *Id.*, at 253 (citation omitted).
   A number of state courts have held that saliva samples are to be collected upon probable cause and a search warrant. *See State v. Ostroski*, 201 Conn. 534, 518 A.2d 915 (1986); *State v. Reeves*,

The variety of items of physical evidence which law enforcement officials might seek from an individual's person can best be thought of along a continuum. Cast in terms of those items upon which the courts have already spoken, on one end of the continuum are things such as voice, hair and handwriting samples. These items are outwardly manifested and in the public domain. Obtaining these samples does not implicate any privacy or dignity interests and can be affected without a full Fourth Amendment procedure. Slightly removed from these extremes, toward the middle of the continuum, one might find breath sample tests. A breath sample cannot disclose information about an individual's genetic identity which might implicate a privacy interest, yet it can reveal to some degree the presence of items such as intoxicants in an individual's system. The method of obtaining such a sample is non-invasive and cannot be said to substantially offend human dignity.

On the other end of the continuum is a blood sample and presumably other internal fluids which could only be obtained by extracting them from the body. Obtaining such samples requires full compliance with Fourth Amendment procedures. These items are not in the public domain and privacy and dignitary interests are implicated by the method of obtaining the sample—an individual is required to submit to an agent of the state who extracts the sample by penetrating the subject's body. Slightly removed from this extreme is the urine sample. Such a sample can, like a blood sample, reveal a range of genetic identity features as well as the presence of chemicals within one's system. While the fluid is bound to be expelled, it is not about to be offered to the public domain either. Moreover, as noted above, the method of collection implicates the individual's dignitary interests.

It seems that saliva samples fall squarely in the middle of this continuum. A saliva sample can provide a significant amount of genetic identity information and it is generally not an item in the public domain. Yet, expectorating is not viewed with the same disfavor nor concealed behind closed doors as urinating; consider the commonplace sight of athletes expectorating on national television on a daily basis. Therefore, it is similar to urine in the "host of private medical facts about an [individual]" which might be revealed by the chemical analysis of the sample fluid, yet it is different from urine in that it may lack an attendant expectation of privacy surrounding the act of providing a saliva sample. Thus, the process of obtaining a saliva sample must be considered to determine whether it too raises the issue of the subject's dignitary interests and expectations of privacy.

It is typically the case that a saliva sample is obtained by swabbing the inside of the subject's mouth with a pad of some sort.[8] Such a scenario, wherein a citizen is directed to submit to an intrusion into his body, is properly viewed as implicating his dignitary interests. This factor, combined with the private identifying information contained in the sample suggests that a proper compliance with the requirements of the Fourth Amendment is mandated.

■ This conclusion is compelled under the two-step *Schmerber* analysis. Such a procedure is clearly a search within the skin, if not literally beneath it. Also, at least in this case, the evidence sought—samples of saliva to be used in the prosecution of a charge of sending threatening mail by comparing the sample provided with saliva traces on the letters sent in the mail—is neither evanescent nor sought under any other sort of exigent circumstance.[9] Thus, this is a case

234 Kan. 250, 671 P.2d 553 (1983); *Pyle v. State*, 645 P.2d 1390 (Okla.Crim.App.1982).

8. In response to a query from this Court, the Government has stated that analysts from the laboratories of the Federal Bureau of Investigation have indicated that "although a usable sample may be obtained by allowing the defendant to expectorate into a receptacle, the preferred method of obtaining the [sample] for this type of

DNA analysis and comparison is to swab the inside of the mouth including the [cheek] and gum areas" for a variety of listed reasons. Gov't Letter, dated May 3, 1995.

9. One commentator has noted that "the following procedures for detention of evanescent evidence have been found reasonable: trace metal detection test, examination under ultraviolet light, breath samples, gunshot residue swabbing,

where the determination whether "the right of privacy must reasonably yield to the right of search is ... to be decided by a judicial officer" upon a proper showing of probable cause. *Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948).

If the collection of the sample could be obtained by the subject expectorating into a receptacle the affront to the individual's dignitary interest would be minimal, if any. Such a production of fluid is not accompanied with the personal and private character of voiding a urine sample. Moreover, there is no intrusion into the subject's body at all. Nevertheless, the identity information contained within the sample implicates the subject's privacy interests. This sample collection method might be best analogized to the breathalyzer test as opposed to the urinalysis. It is, therefore, also properly deemed a search under the Fourth Amendment as stated in *Skinner,* at 617, 109 S.Ct. at 1413, but one whose method is minimally intrusive and, hence, clearly reasonable when supported by a properly executed warrant.

*CONCLUSION*

For the foregoing reasons, the requirements of our Constitution require that the Government make a proper application to a judicial officer to ensure the proper protection of a citizen's rights. The defendant's motion to quash is, therefore, granted.

SO ORDERED.

removal of a hair sample, pubic hair combing, penis swabbing, and blood samples." *See* Hall, 2 *Search and Seizure* § 24.13, text and notes at fn. 9–16 (collecting cases).