762 A.2d 1239 (2000)
In re NONTESTIMONIAL IDENTIFICATION ORDER DIRECTED TO R.H.
No. 99-353.
Supreme Court of Vermont.
September 1, 2000.
Motions to Stay Mandate Denied September 25, 2000 and October 4, 2000.
*1240 William H. Sorrell, Attorney General, and David Tartter, Assistant Attorney General, Montpelier, for Plaintiff-Appellee.
Robert Appel, Defender General, and Henry Hinton, Appellate Attorney, Montpelier, for Defendant-Appellant.
Present: AMESTOY, C.J., DOOLEY, MORSE, JOHNSON and SKOGLUND, JJ.
DOOLEY, J.
Defendant R.H. appeals from an order of the Lamoille District Court holding him in civil contempt for refusing to comply with a nontestimonial identification order that required him to submit to the collection of cheek epithelial cells (saliva) by swabbing the interior of his mouth. On appeal, defendant argues that (1) the affidavit filed in support of the nontestimonial identification order does not show reasonable grounds to suspect that he committed the crime, and (2) Article 11 of the Vermont Constitution and the Fourth Amendment of the United States Constitution require probable cause before a court may authorize collection of saliva by swabbing the inside of the mouth. We affirm.
Vermont Rule of Criminal Procedure 41.1 provides the authority for nontestimonial identification orders (NTOs). Rule 41.1 provides that an NTO must be issued by a judicial officer and be based on a sworn affidavit establishing:
(1) that there is probable cause to believe that an offense has been committed; (2) that there are reasonable grounds, that need not amount to probable cause to arrest, to suspect that the person named or described in the affidavit committed the offense; and (3) that the results of specific nontestimonial identification procedures will be of material aid in determining whether the person named in the affidavit committed the offense.
*1241 V.R.Cr.P. 41.1(c). The order may be issued prior to the arrest of a suspect, after arrest and prior to trial, or during trial if special circumstances warrant it. See id. 41.1(b). The order may require the suspect to appear at a specified time and place for identification by, among other things, fingerprints, blood specimens, urine specimens, saliva samples, hair samples, handwriting examples, or voice samples. See id. 41.1(d), (m)(3). If there is a danger that the suspect may flee, or alter or destroy the evidence sought, the NTO may provide that a law enforcement officer detain the suspect in order to bring the suspect before the judicial officer for expeditious identification procedures. See id. 41.1(d). Rule 41.1 "is intended to provide a procedure equivalent to a search warrant for obtaining nontestimonial identification evidence." Reporter's Notes, V.R.Cr.P. 41.1. Rule 41.1, however, authorizes the detention of suspects for the identification procedure on less than probable cause, requiring only "reasonable grounds" to suspect the subject committed the identified crime. V.R.Cr.P. 41.1.
The NTO in dispute was issued in the course of the investigation of a notorious homicide committed some nine years ago. Patricia Scoville, a 28-year-old woman, was reported missing on October 23, 1991, after she failed to return from a bicycle ride. Her bicycle was found near Moss Glen Falls, a rural, wooded area about four miles outside of Stowe and just off Route 100. After a six-day search, her body was discovered in a shallow grave, hidden under layers of leaves and pine boughs. She had suffered a deep laceration on the back of her head, and the cause of death was found to have been asphyxia. There were indications of sexual assault, and seminal fluid containing DNA was found on the body.
On June 22, 1999, police obtained an NTO requiring defendant to provide a sample of his saliva to compare with the DNA found at the crime scene. The affidavit supporting the request for the NTO indicates that defendant has a history of sexual assault and violence, and that he lived nearand was familiar withthe Moss Glen Falls area at the time of the homicide. It contains the following specific information:
1. Defendant was committed to the Vermont State Hospital in 1972 for four years after assaulting and attempting to rape a female who was traveling alone. Defendant used a knife during this attack. He also attacked two other people while hospitalized.
2. Defendant was convicted of simple assault in 1977, after originally being charged with lewd and lascivious conduct. Further, he was convicted of lewd and lascivious conduct in 1981.[1] Both of these crimes are described in the affidavit as involving "assaults on female strangers."
3. On October 13, 1997, defendant was arraigned on charges of attempted kidnapping and attempted sexual assault, arising out of an incident in which he was in his car when he saw a woman walking alone. He ran up behind her with a belt in his hands, held over his head as if to strangle her. He struggled with the victim, but she eventually escaped.
4. Defendant lived for many years in the area where the Scoville homicide took place, and lived in that area at the time of the homicide. He lived with a girlfriend from the early 1980's until May 1991 in various towns around the area. In 1990 and early 1991, they lived together in Wolcott. During that time defendant was not employed but would leave the house for long periods during the day and drive around in his car.
5. On May 19, 1991, defendant's girlfriend obtained an abuse prevention order *1242 against him, removing him from their home. She claimed that they had a violent relationship: he struck her, threatened to cut off her head with a chain saw, and attempted to rape her. After he was removed from their home, defendant lived with acquaintances in Hyde Park. He had his own car and continued to spend his days driving around. On occasion he would visit relatives in Barre, traveling through Stowe on Route 100, past the area where the Scoville homicide occurred. Also during that time, defendant gave one of the acquaintances with whom he was living, a wrecker operator, detailed directions to a remote area off the Moss Glen Falls Road in Stowe, an area close to the where the Scoville body was recovered. Then, in the Fall of 1991, he was asked to move out of his acquaintances' residence because of an unprovoked attack on a mutual friend.
On the basis of these facts, the Lamoille District Court issued an NTO requiring defendant to give a sample of his saliva to compare his DNA to that found on the Scoville body. Defendant moved to quash the NTO, arguing that the affidavit failed to show reasonable suspicion that he murdered Patricia Scoville, and, in any event, that the applicable provisions of the federal and Vermont constitutions require that the prosecution show probable cause that he was responsible. The district court rejected the constitutional argument and held that the prosecution had shown reasonable suspicion that defendant killed Patricia Scoville based on his opportunity to commit the crime, his familiarity with the area, and his long history of sexual assault on women.
When defendant failed to appear as ordered pursuant to the NTO, the court held him in contempt. Defendant appeals from that contempt adjudication raising the same challenges as he raised in the district court.
There is no claim that the prosecution has not met the first and third of the three prongs of the NTO standardthere is probable cause that an offense has been committed, and the results of the NTO procedure will be of "material aid" in determining whether defendant committed the crime. Thus, the first question before us is whether the prosecution's showing meets the second prong of the NTO requirements: Are there reasonable grounds to suspect that defendant committed the offense?
This prong involves a familiar standard, essentially identical to that established in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), to determine whether police may stop a suspect for questioning. See Reporter's Notes, V.R.Cr.P. 41.1; State v. Cootz, 110 Idaho 807, 718 P.2d 1245, 1248 (1986) (similar Idaho statute authorizes "form of Terry stop"). We have applied this standard in numerous cases, and these cases help define both the standard and how it is applied. We begin with the teaching of Terry that reasonable suspicion must involve sufficient specific and articulable facts, which, together with the rational inferences therefrom, reasonably warrant the intrusion contemplated. See Terry, 392 U.S. at 21-22, 88 S.Ct. 1868; State v. Lambert, 146 Vt. 142, 143, 499 A.2d 761, 762 (1985). This is to avoid intrusions based on "nothing more substantial than inarticulate hunches." Terry, 392 U.S. at 22, 88 S.Ct. 1868; see also State v. Taylor, 145 Vt. 437, 440-41, 491 A.2d 1034, 1036 (1985) (reasonable suspicion is more than an "inchoate and unparticularized suspicion or hunch"). The reasonable suspicion standard is less demanding than the probable cause standard, see State v. Lamb, 168 Vt. 194, 196, 720 A.2d 1101, 1102 (1998), and requires "`considerably less than a proof of wrongdoing by a preponderance of the evidence.'" See State v. Siergiey, 155 Vt. 78, 81, 582 A.2d 119, 121 (1990) (quoting United States v. Sokolow, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989)).
*1243 The information supporting an NTO must be evaluated "in a common sense manner under the totality of the circumstances." State v. Towne, 158 Vt. 607, 618, 615 A.2d 484, 490 (1992). The officer can, as here, rely on the observations of others. See Lamb, 168 Vt. at 196, 720 A.2d at 1102. Information about a suspect's behavior from a citizen who is not a paid informant and is unconnected to the police is presumed reliable. See State v. Welch, 162 Vt. 635, 636, 650 A.2d 516, 518 (1994) (mem.). The officer can rely in part on inferences based on general experience, see State v. Miller, 142 Vt. 49, 53, 451 A.2d 1115, 1117 (1982), and on past criminal behavior of a suspect. See Lamb, 168 Vt. at 196-97, 720 A.2d at 1102-03.
We acknowledge that there is no direct evidence of defendant's involvement in the crime. No one saw him at the scene of the crime. Nothing was found there that could tie defendant to the crime. He has never made a statement that could be interpreted as demonstrating responsibility.
On the other hand, there is strong evidence of opportunity because defendant was familiar with the remote area in which the crime occurred, and at the time of the homicide, he was spending days driving around in his automobile with no specific destination. He has a long history of violence against women, the most recent episode of which involved conduct very consistent with how Patricia Scoville's killer must have acted. This shows that he had the means to commit the crime and may have acted on the chance encounter with a woman alone on a bicycle in a remote place. The facts supporting defendant's involvement are specific and articulable. We conclude that they, and the rational inferences that can be derived from them, show reasonable suspicion that defendant killed Patricia Scoville sufficient to warrant issuance of the NTO. See State v. Ripperger, 514 N.W.2d 740, 747 (Iowa Ct. App.1994) (NTO, issued against defendant in a rape case, was justified by reasonable suspicion where defendant lived near the victims, knew one of them, and fit the general description of the suspect in height, weight, and hair color and length); In re Fingerprinting of M.B., 125 N.J.Super. 115, 309 A.2d 3, 7 (App.Div.1973) (order to fingerprint all male members of grammar school class justified where class ring was found nearby body of nonresident murder victim and victim's car, with unidentified fingerprints in it, was found the next day on street in town of grammar school).
In reaching this conclusion, we have examined the cases in which we did not find reasonable suspicion of criminal conduct. Defendant points us particularly to State v. Kettlewell, 149 Vt. 331, 544 A.2d 591 (1987), as a relevant example of a case where the facts were insufficient to support a seizure on reasonable suspicion. In Kettlewell, an informant told the police that "Mexicans" were on his land and that he did not know whether they were legal or not. We held that this equivocal statement, together with the fact that the suspects were speaking a Spanish dialect spoken in Mexico and were in a type of vehicle often used to smuggle aliens, was not sufficiently specific to justify the detention of the suspects. See id. at 338-39, 544 A.2d at 595. In Kettlewell, we were required to infer, based on very general evidence, that both a crime had been committed and the suspects had committed it. In contrast, in this case there is overwhelming evidence of a crime, and the factual showing that defendant may have committed it is very specific and detailed. Kettlewell is an example of the kind of hunch we have viewed as insufficient to justify detention of a suspect. This case involves more than a hunch.
Because we conclude that the district court properly found reasonable suspicion to believe that defendant committed the offense, we must address defendant's argument that this showing is inadequate to meet minimum constitutional requirements. We first consider Article 11 of *1244 Chapter I of the Vermont Constitution, under which we have already considered the constitutionality of the NTO requirements as embodied in Rule 41.1. We held in Towne, 158 Vt. at 621, 615 A.2d at 492, that a court can issue an NTO for the taking of a pubic hair sample only on a showing of probable cause to believe that defendant committed a crime, the traditional standard for the issuance of a search warrant. Arguing that the Towne holding is based on the fact that the search involved an area of the body traditionally concealed from public view, defendant asks us to hold that the inside of the mouth is similarly protected so that probable cause should also be required in this case. In further support of this argument, he notes that the NTO in this case will require the officer who implements the order to venture beyond the surface of the body.
We do not believe that defendant's argument captures the essence of Towne. In establishing the line beyond which probable cause is required, we relied in Towne on State v. Kirchoff, 156 Vt. 1, 10, 587 A.2d 988, 994 (1991), for the proposition that Article 11 protects persons from governmental intrusion into affairs they chose to keep private. We also relied upon the analysis of Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, 617, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), which, while evaluating a requirement to give a urine sample, noted that the passing of urine is done privately, as a matter of both social custom and law. The point of our analysis was that persons cover pubic hair as a matter of personal privacy, and are often required to do so by law.
Although the inside of one's mouth is often hidden from public view, exposing it does not entail the embarrassment and social discomfort which accompanies the sexual and excretory functions associated with the pubic area. See United States v. Nicolosi, 885 F.Supp. 50, 55 (E.D.N.Y. 1995) (expectorating not viewed with same disfavor nor concealed behind closed doors as urinating; therefore, saliva lacks attendant expectation of privacy surrounding urination). Indeed, by talking and yawning, we frequently expose the interior of our mouth to public view.
Nor do we find controlling significance in the fact that saliva is taken from a body cavity. By this argument, defendant is attempting to liken the taking of a saliva sample to the taking of a blood sample, as involved in the leading case of Schmerber v. California, 384 U.S. 757, 769-70, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) (drawing blood was intrusion beyond body's surface). Our discussion of Schmerber in Towne suggests that we would also require probable cause for the taking of a blood sample. See Towne, 158 Vt. at 621, 615 A.2d at 491-92; see also State v. Carter, 322 N.C. 709, 370 S.E.2d 553, 556 (1988) (order to withdraw blood requires probable cause under Article I, § 20 of North Carolina Constitution). We believe, however, that the critical element of Schmerber is that blood was removed by piercing the skin. See Skinner, 489 U.S. at 625, 109 S.Ct. 1402 (distinguishing blood tests because they require piercing skin); Nicolosi, 885 F.Supp. at 53 (the critical distinction is between "physical evidence below the skin" and physical evidence "outside the skin"). We do not believe that taking a saliva sample by swabbing a pad on the inside of the mouth involves the same intrusiveness as drawing blood by piercing the skin with a needle.
On the basis of the above analysis, we conclude that Article 11 does not require that the prosecution demonstrate probable cause in order to obtain an NTO for saliva taken from the mouth. The finding of reasonable suspicion suffices to comply with the requirements of Article 11.
Finally, defendant challenges the NTO based only on reasonable suspicion as authorized by Rule 41.1 under the United States Constitution, arguing that the collection of saliva on less than probable cause violates the Fourth Amendment. Although this argument has been raised *1245 twice previously, we have not addressed it because in those cases we found probable cause to believe that defendant committed the offense. See Towne, 158 Vt. at 618-19, 615 A.2d at 490; State v. Howe, 136 Vt. 53, 64, 386 A.2d 1125, 1132 (1978).
The Fourth Amendment, in two clauses, provides that the people have the right "to be secure in their persons ... against unreasonable searches and seizures," and that "no warrants shall issue, but upon probable cause." U.S. Const. amend. IV. Until the 1960s, the need for probable cause contained in the second clause was treated as an absolute to meet the standard of reasonableness contained in the first clause. See Dunaway v. New York, 442 U.S. 200, 207-08, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). However, in 1968, in Terry v. Ohio, 392 U.S. at 24-26, 88 S.Ct. 1868, the Supreme Court held that stopping a suspect for questioning and frisking the suspect for weapons was an intrusion so much less severe than that involved in a traditional arrest that the reasonableness requirement of the Fourth Amendment could be met by something less than probable cause. The Court held that what was required was merely that there be sufficient facts available to warrant a person of reasonable caution to form the belief that the action taken was appropriate. See id. at 22, 88 S.Ct. 1868. As described above, Terry announced the reasonable suspicion standard.
One year later, the Supreme Court decided Davis v. Mississippi, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969), in which it suggested that detentions for fingerprinting might comply with the Fourth Amendment on less than probable cause. In Davis, a woman who was raped in her home could identify her attacker only as a black youth. During the investigation, the police detained defendant and twenty-three others for fingerprinting and questioning without probable cause. Although the Court found a violation of the Fourth Amendment in this warrantless interrogation, it suggested that a procedure could be drafted that authorized fingerprinting on a showing short of probable cause:
Detentions for the sole purpose of obtaining fingerprints are no less subject to the constraints of the Fourth Amendment. It is arguable, however, that, because of the unique nature of the fingerprinting process, such detentions might, under narrowly defined circumstances, be found to comply with the Fourth Amendment even though there is no probable cause in the traditional sense.... Detention for fingerprinting may constitute a much less serious intrusion upon personal security than other types of police searches and detentions. Fingerprinting involves none of the probing into an individual's private life and thoughts that marks an interrogation or search. Nor can fingerprint detention be employed repeatedly to harass any individual, since the police need only one set of each person's prints. Furthermore, fingerprinting is an inherently more reliable and effective crime-solving tool than eyewitness identifications or confessions and is not subject to such abuses as the improper line-up and the "third degree." Finally, because there is no danger of destruction of fingerprints, the limited detention need not come unexpectedly or at an inconvenient time.
Id. at 727, 89 S.Ct. 1394 (citations omitted).
In response to Davis, Vermont and eight other states adopted NTO procedures. This trend slowed, however, when the Supreme Court decided Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), reinforcing the principle that probable cause was necessary for in-custody interrogation, even where there has been no formal arrest. The Court emphasized that "[a] single, familiar standard is essential to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront." Id. at 213-14, 99 S.Ct. 2248. The Court acknowledged *1246 the dicta in Davis, but noted that Davis had left open whether a procedure for obtaining fingerprints without probable cause would be valid.
More recently, in Hayes v. Florida, 470 U.S. 811, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985), the Supreme Court repeated its suggestion that "under circumscribed procedures, the Fourth Amendment might permit the judiciary to authorize the seizure of a person on less than probable cause and his removal to the police station for the purpose of fingerprinting." Id. at 817, 105 S.Ct. 1643. The Court appeared to endorse more directly a stop to conduct fingerprinting "in the field":
There is thus support in our cases for the view that the Fourth Amendment would permit seizures for the purpose of fingerprinting, if there is reasonable suspicion that the suspect has committed a criminal act, if there is reasonable basis for believing that fingerprinting will establish or negate the suspect's connection with that crime, and if the procedure is carried out with dispatch.
Id.[2] Also, it noted that some states had relied upon Davis to enact procedures for judicially authorizing seizures for the purpose of fingerprinting. See id. The Court was referring to procedures, like our Rule 41.1, which have been adopted by legislation or rule in at least nine states.[3] See Note, DNA Typing: A New Investigatory Tool, 1989 Duke L.J. 474, 489 (1989).
Although the direction from the Supreme Court is more tentative and limited than we would like, we conclude that the Court is prepared to uphold at least some nontestimonial identification procedures based only on reasonable suspicion, with appropriate safeguards. Most commentators have reached this conclusion. See 4 W. LaFave, Search and Seizure § 9.7(b), at 327 (3d ed.1996); Comment, DNA "Line-Ups" Based on a Reasonable Suspicion Standard, 71 U. Colo. L.Rev. 221, 253-54 (2000); Note, supra, at 494. Most state court decisions have also reached this conclusion. See State v. Rodriguez, 186 Ariz. 240, 921 P.2d 643, 650 (1996) (based on Arizona NTO statute); People v. Madson, 638 P.2d 18, 32 (Colo.1981) (based on Colorado NTO rule); Wise v. Murphy, 275 A.2d 205, 216 (D.C.Ct.App.1971); Baker v. State, 449 N.E.2d 1085, 1090 (Ind.1983); In re Fingerprinting of M.B., 309 A.2d at 7; State v. Hall, 93 N.J. 552, 461 A.2d 1155, 1160 (1983); In re Order Requiring Fingerprinting of a Juvenile, 42 Ohio St.3d 124, 537 N.E.2d 1286, 1288-89 (1989) (based on Ohio statute allowing court to authorize photographing or fingerprinting of a juvenile). In general, the decisions that have rejected this conclusion have relied upon Dunaway with the mistaken view that it had superseded the invitation of Davis. See State v. Evans, 215 Neb. 433, 338 N.W.2d 788, 793 (1983); In re Abe A., 56 N.Y.2d 288, 452 N.Y.S.2d 6, 437 N.E.2d 265, 269 (1982); In re Armed Robbery, Albertson's, on August 31, 1981, 99 Wash.2d 106, 659 P.2d 1092, 1095 (1983). We think that Hayes dispels this interpretation of Dunaway.
In general, we believe that the NTO procedure in Rule 41.1 comports with the Davis dicta and thus with the Fourth Amendment despite the fact that an NTO can be issued on a showing of only reasonable suspicion. The order is an advanced judicial determination akin to a warrant. Although the court initially sets a time and date for appearance, it must modify that time and date on application of the person *1247 named "whenever it appears reasonable under the circumstances to do so." V.R.Cr.P. 41.1(e). The person named may not be detained for longer than necessary to perform the NTO procedure. See id. 41.1(i). The order must be served on the person named and contain: (1) the procedures to be conducted, the methods used and the approximate length of time involved, see id. 41.1(h)(3); (2) the grounds to suspect that the person committed the offense, see id. 41.1(h)(4); (3) that the person will be under no obligation to submit to interrogation or make any statement, except possibly for voice identification, during the procedure, see id. 41.1(h)(5); and (4) that the person can seek a reasonable modification of the place and time of appearance, and request a procedure other than a line-up be conducted at his place of residence, see id. 41.1(h)(6). The person named may challenge the order "at any time." Id. 41.1(l).
In People v. Madson, 638 P.2d at 31-32, the Colorado Supreme Court concluded that an NTO procedure would have to meet the following standards to be constitutional under Davis:
First, there must be an articulable and specific basis in fact for suspecting criminal activity at the outset. Second, the intrusion must be limited in scope, purpose and duration. Third, the intrusion must be justified by substantial law enforcement interests. Last, there must be an opportunity at some point to subject the intrusion to the neutral and detached scrutiny of a judicial officer before the evidence obtained therefrom may be admitted in a criminal proceeding against the accused.
As we have interpreted it generally, and applied it in this case, our NTO procedure meets each of these standards.
We recognize that the decisions of the United States Supreme Court have involved the narrow question of obtaining fingerprints. We conclude that the basic elements of saliva sampling for DNA are similar to the characteristics of fingerprinting as described in Davis. Like fingerprinting, saliva sampling involves no intrusion into a person's life or thoughts; it can not be used repeatedly to harass; it is not subject to abuses like the improper line-up or the third degree. DNA comparison "is an inherently more reliable and effective crime-solving tool than eyewitness identifications or confessions." Davis, 394 U.S. at 727, 89 S.Ct. 1394. As we concluded under our analysis of conformity with the Vermont Constitution, we do not believe a saliva procedure involves a "serious intrusion upon personal security." Id. In reaching this conclusion, we reject the analysis of the main precedent relied upon by defendant, Nicolosi, 885 F.Supp. at 55, a case that required a showing of probable cause to order a taking of saliva for DNA comparison, but did not involve a narrowly-tailored procedure complying with Davis. We need not decide today whether other NTO procedures, for example, withdrawal of blood, would similarly meet constitutional muster under the Fourth Amendment. See Hall, 461 A.2d at 1161 & n. 7 (reserving whether order to remove blood, based only on reasonable suspicion, complies with Fourth Amendment).
Although we are satisfied that Rule 41.1 is sufficiently complete to decide this case, we conclude from our use of it that it warrants review in light of the developments that have occurred since its adoption in 1973, long before DNA identification techniques became available. Its provisions were taken from a proposed federal rule that was never adopted. See Note, supra, at 476; Reporter's Notes, V.R.Cr.P. 41.1. Commentators have urged procedural protections not found in our rule, and other states have adopted such protections. See, e.g., Note, supra, at 493 (destruction of samples from nonmatching suspects; right to have counsel present during taking of sample); Comment, supra, at 252 (destruction of samples of nonmatching suspects). The Federal Judicial Conference *1248 ultimately decided not to recommend adoption of the federal rule by the United States Supreme Court in order to have the benefit of more experience with the procedures in the states. See Note, supra, at 489. We should also use the benefit of this experience.
Thus, by this opinion, we ask our Advisory Committee on the Rules of Criminal Procedure to review the provisions of Rule 41.1 in light of the experience with the rule in this state, the experience with similar rules in other states, and the new technologies used in suspect identification. See State v. Conn, 152 Vt. 99, 105, 565 A.2d 246, 249 (1989) (similar referral on procedures involved in waiving jury trials). In making this referral, we do not intend to withdraw the support of this Court for a strong and effective nontestimonial identification procedure rule. Indeed, this case demonstrates why such a court-supervised procedure is needed as an essential tool in the investigation of serious crimes.
Affirmed.
NOTES
[1] Although the affidavit states that defendant was convicted of felony lewd and lascivious conduct, the defendant points out that the 1981 conviction was for misdemeanor lewdness. This does not affect our analysis.
[2] In a concurring opinion, Justice Brennan criticized the majority for reaching out in dicta to "virtually ... hold that on-site fingerprinting without probable cause or a warrant is constitutionally reasonable." Hayes, 470 U.S. at 819, 105 S.Ct. 1643 (Brennan, J., concurring).
[3] Alaska R. Ct. 16(c)(1)-(2) (1988); Ariz.Rev. Stat. Ann. § 13-3905 (1978); Colo. R.Crim. P. 41.1 (1984); Idaho Code Ann. § 19-625 (1987); Iowa Code Ann. § 810.1-.2 (West 1978 and Supp.1988); Neb.Rev.Stat. §§ 29-3301 to -3307 (1985); N.C. Gen.Stat. §§ 15A-271 to -282 (1983); Utah Code Ann. §§ 77-8-1 to -4 (1982).