2008 VT 53



State v. Martin (2006-119 &
2006-205)

 

2008 VT 53

 

[Filed 02-May-2008]

 

NOTICE:  This opinion is
subject to motions for reargument under V.R.A.P. 40
as well as formal revision before publication in the Vermont Reports. 
Readers are requested to notify the Reporter of Decisions, Vermont Supreme
Court, 109
 State Street, Montpelier, Vermont05609-0801
of any errors in order that corrections may be made before this opinion goes to
press.

 

 


 2008 VT 53
 
  


 Nos. 2006-119 & 2006-205
 
  


 State of Vermont
 
 
 Supreme Court
 
 
  
 
 
  
 
 
  
 
 
 On Appeal from
 
 
      v.
 
 
 District Court of Vermont,
 
 
  
 
 
 Unit No. 2, Addison
 Circuit
 
 
  
 
 
  
 
 
 George Dean Martin
 
 
 March Term, 2007
 
 
  
 
 
  
 
 
 State of Vermont
 
 
  
 
 
  
 
 
    
 v.
 
  

Mark Watkins, Richard Washington, Joey Thibault,

Raymond St. Peter, Steven Martin, Michael Lewis, 

Travis Lamberton, Dennis Barbour
and Joseph Williams

 

Matthew I. Katz, J. (06-119)

Linda Levitt, J. (06-205)

 

William H. Sorrell, Attorney General, and John R. Treadwell,
Assistant Attorney General,  

  Montpelier, for Plaintiff-Appellee
(06-119) and Plaintiff-Appellant (06-205).

 

Rory Malone, Prisoners’ Rights Office, Montpelier, for
Defendant-Appellant (06-119)

  and Defendants-Appellants/Cross-Appellees
(06-205).

 

 

PRESENT:  Reiber, C.J.,
Dooley, Johnson, and Burgess, JJ., Devine, D.J., Specially Assigned

 

 

¶ 1.            
REIBER, C.J.   These consolidated appeals from the
Addison and Chittenden District Courts present the question of whether the
State may, in keeping with Chapter I, Article 11 of the Vermont Constitution,
require convicted nonviolent felons to provide DNA samples for inclusion in
state and federal DNA databases under the terms of 20 V.S.A. §§
1931-1946.  We conclude that it may.  Accordingly, we affirm the
judgment of the Addison District Court and reverse the judgment of the
Chittenden District Court.

I.  The Vermont DNA Database and Data Bank

¶ 2.            
Since 1998, Vermont has required at least some felons to submit a DNA
sample for analysis and inclusion in the state and federal DNA databases. 
See 1997, No. 160 (Adj. Sess.), § 1 (effective April
29, 1998).  The purposes of the DNA-sampling statute, as the Legislature
announced in 1998, are as follows:

 
It is the policy of this state to assist federal, state and local criminal
justice and law enforcement agencies in the identification, detection or
exclusion of individuals who are subjects of the investigation or prosecution
of violent crimes.  Identification, detection and exclusion may be
facilitated by the DNA analysis of biological evidence left by the perpetrator
of a violent crime and recovered from the crime scene.  The DNA analysis
of biological evidence can also be used to identify missing persons.  

 

20 V.S.A. §
1931.  These express purposes remain unchanged.

¶ 3.            
Under the § 1933 of the 1998 statute, only certain offenders were
required to submit to DNA sampling: those convicted of certain listed felonies,
20 V.S.A. § 1932(12)(A)-(Q) (2000); those convicted of an attempt to commit a
listed felony, id. § 1932(12)(R); and those whose plea agreements
included a sampling requirement, id. § 1932(12)(S).  In 2005, the
Legislature amended the DNA statute, expanding the list of crimes to include
all felonies and attempted felonies.  See 2005, No. 83, § 7 (effective
June 28, 2005) (codified as amended at 20 V.S.A. § 1932(12)).  The amended
statute provides that 

(a)
The following persons shall submit a DNA sample:

(1) 
every person convicted in a court in this state of a designated crime on or
after the effective date of this subchapter; and

(2)
every person who was convicted in a court in this state of a designated crime
prior to the effective date of this subchapter and, after the effective date of
this subchapter, is:

(A)   
in the custody of the commissioner of corrections pursuant to 28 V.S.A. § 701;

(B)   
on parole for a designated crime;

(C)   
serving a supervised community sentence for a designated crime; and

(D)   
on probation for a designated crime.

 

20
V.S.A. § 1933 (Cum. Supp. 2007).  At issue in these appeals is the
application of the amended statute to nonviolent felons, who would not have
been subject to sampling under the 1998 enactment.

¶ 4.            
A DNA sample is “a tissue sample” and “may be blood or other tissue type
specified by the [D]epartment [of Public
Safety].”  Id. § 1932(5).  Samples must be taken using the
“least intrusive means” that the Department of Public Safety (DPS) determines
are scientifically reliable.  Id. § 1934(a).  The DPS
regulations currently in force state that “[a]ll DNA
samples will consist of a tube of blood unless the DPS develops a less invasive
method.  That method would then become the method to collect DNA
samples.”  DNA Database Unit Operating Policy and Procedures § III.A.1, 8
Code of Vermont Rules 28 060 001-3 to -4. 

¶ 5.            
The statute authorizes three uses for the DNA samples.  First, the
samples may be analyzed “to type the genetic markers . . . for law enforcement
identification purposes.”  Id. § 1937(a)(1).  The typing
tests produce a “DNA record,” or “profile,” of the sample.  Id.
§ 1932(4).  It is this profile that serves to uniquely identify the
sampled individual.  The profile may be stored in either a state DNA
database, the federal Combined DNA Index System (CODIS), or other foreign
databases.  Id. §§ 1932(4), 1936.[1] 
Second, “if personal identifying information is removed, [DNA samples may be
used] for protocol development and administrative purposes, including: (A)
development of a population database; (B) to support identification protocol
development of forensic DNA analysis methods; and (C) for quality control
purposes.”  Id. § 1937(2).  Finally, DNA samples may be used
to identify human remains.  Id. § 1937(3).

¶ 6.            
Section 1941 provides that all DNA samples “shall be confidential” and
“shall not be used for any purpose other than as provided in [§ 1937]” or to
identify missing persons.  The statute also provides both criminal and
civil penalties for violations of the confidentiality provisions.  See id.
§ 1941(c) (“Any person who intentionally violates this section shall be
imprisoned not more than one year or fined not more than $10,000.00, or both”);
id. § 1941(d) (“Any individual aggrieved by a violation of this section
may bring an action for civil damages including punitive damages, equitable
relief, including restraint of prohibited acts, restitution of wages or other
benefits, reinstatement, costs, reasonable attorney’s fees and other
appropriate relief.”).  Penalties are also provided for tampering with DNA
samples.  Id. § 1945 (“A person who knowingly or intentionally,
without lawful authority, tampers or attempts to tamper with a DNA sample shall
be imprisoned not more than three years or fined not more than $10,000.00, or
both.”).  The statute further requires expungement
of DNA records and destruction of samples if a person’s conviction is reversed
on appeal or if a person is granted a full pardon.  Id. § 1940. 

I.  Procedural History

¶ 7.            
These cases comprise the appeals of ten defendants convicted of
“designated crimes” between 1999 and 2005.  See 20 V.S.A. §
1932(12).  Defendant George Dean Martin was convicted in 2004, in the
Addison District Court, of two counts of boating while intoxicated, death resulting.[2]  The other nine defendants’
convictions, all in Chittenden District Court, were for the following offenses:
conspiracy to deliver cocaine, escape, larceny, false pretenses, possession of
marijuana, violation of conditions of release, possession of heroin, violation
of probation, third-offense driving under the influence, aiding in the
commission of a felony, and violation of an abuse-prevention order.  These
offenses are felonies, and all of the defendants here are therefore subject to
the sampling requirements in the amended § 1933.[3]

¶ 8.            
Defendant Martin and the nine Chittenden defendants all refused to
provide samples, and the State moved to compel them to provide same.  See
20 V.S.A. § 1935(a) (“If a person who is required to provide a DNA sample under
this subchapter refuses to provide the sample, the commissioner of the
department of corrections or public safety shall file a motion in the district
court for an order requiring the person to provide the sample.”).  The
Addison court granted the State’s motion, concluding that the sampling statute
did not run afoul of either the Fourth Amendment or Article 11.  The
Chittenden court, by contrast, denied the motion and granted defendants’
motions to dismiss, holding that the expansion of the sampling statute to
require samples from all felons, though permissible under the Fourth Amendment,
violated Article 11.    Defendant Martin appeals the
Addison court’s order, and the State appeals the Chittenden order.  See 20
V.S.A. § 1935(g) (providing appeal to this Court as a matter of right from
decision on motion to require DNA sample).  Both appeals squarely present
the question of whether Vermont’s DNA database statute, as applied to nonviolent
felons, violate Chapter I, Article 11 of the Vermont Constitution.  We
review this question of law de novo.[4]

III.  Article 11

¶ 9.            
Vermont’s Chapter I, Article 11, though “similar in purpose and effect”
to the Fourth Amendment to the United States Constitution, State v. Record,
150 Vt. 84, 86, 548 A.2d 422, 424 (1988), provides freestanding protection that
in many circumstances exceeds the protection available from its federal
counterpart.  See, e.g., State v. Berard,
154 Vt. 306, 310-11, 576 A.2d 118, 120-21 (1990).  Like the Fourth
Amendment, “Article 11 does not contemplate an absolute prohibition on warrantless searches or seizures, but circumstances under
which warrantless searches or seizures are permitted
must be jealously and carefully drawn.”  State v. Welch, 160 Vt.
70, 78-79, 624 A.2d 1105, 1110 (1992).  We do not lightly depart from the
warrant and probable-cause requirements,  as we noted in Berard:

Whatever
the evolving federal standard, when interpreting Article Eleven, this Court
will abandon the warrant and probable-cause requirements, which constitute the
standard of reasonableness for a government search that the Framers
established, only in those exceptional circumstances in which special needs,
beyond the normal need for law enforcement, make the warrant and probable-cause
requirement impracticable.

 

154
Vt. at 310-11, 576 A.2d at 120-21 (quotations and citations omitted). 
Requiring the State to demonstrate that it has special needs for a warrantless, suspicionless search
or seizure “focuses attention on the nature and extent of those needs and
allows the courts, as the traditional protectors of Fourth Amendment rights, to
pursue the necessary balancing test in a manner calculated to interfere least
with preservation of those rights.”  Id. at 311, 576
A.2d at 121.[5] 
Once we determine that a special need exists, we balance the need served
against the privacy intrusion at stake.  Id. at 313, 576 A.2d at
122. This is at root a balancing between the constitutional imperatives
announced in Article 11 and Article 1.  Cf. Record, 150 Vt. at 87,
548 A.2d at 424 (“We recognize that in order to preserve Article One interests
the government may properly exercise its inherent power to limit in a very
minor way the mobility of some of its citizens.” (quotations
omitted)).[6] 
As a backdrop to our analysis of the DNA sampling statute, we recount the
development of our special-needs jurisprudence.

¶ 10.        
We begin with a case, State v. Record, that predates our adoption
of the special-needs exception, but which is nonetheless instructive for the
case at bar.  150 Vt. 84, 548 A.2d 422.  In Record, we upheld
a program of random roadside sobriety checkpoints against an Article 11
challenge.  We noted that “[t]he primary evil sought to be avoided by
Article Eleven was the issuance and enforcement of general warrants.”  Id. at 85, 548 A.2d at 423 (citing Lincoln v.
Smith, 27 Vt.
328, 346 (1855)).[7] 
The framers abhorred the general warrant because they did not believe that “it
should be left to the officer to judge of the ground of suspicion; but that
this belonged to the magistrate.”  Lincoln, 27 Vt. at 350.  We
held in Record, however, that the seizures at the sobriety checkpoint
were justified because they “enabled the police to apprehend intoxicated
drivers who may have otherwise posed a serious threat to society.”  150
Vt. at 86, 548 A.2d at 424.  Further, the evil sought to be prevented by
Article 11’s bar on general warrants—to wit, unchecked discretion in agents of
the state to search, seize, or arrest—was minimized because “the written police
guidelines prevented arbitrary police conduct, and the scope of the roadblock
was narrowly drawn.”  Id.

¶ 11.        
Our special-needs jurisprudence began as such with State v. Berard, 154 Vt. 306, 576 A.2d 118, in which we upheld
random, suspicionless searches of prison cells. 
In Berard, we adopted the special-needs test
suggested by Justice Blackmun’s dissent in O’Connor v. Ortega, 480 U.S.
709, 741, 744 n.8 (1987).  We concluded in Berard
that “court[s] should invoke a balancing test as the measure of [Article 11]
values only when the warrant and probable cause requirements do not present a
practical alternative.”  154 Vt. at 311, 576 A.2d at 121. 
“ ’Through the balancing test, [courts] then try to identify a standard of
reasonableness, other than the traditional one, suitable for the
circumstances.  The warrant and probable-cause requirements, however,
continue to serve as a model in the formulation of the new standard.’ “ Id.
(quoting O’Connor, 480 U.S. at 744 n.8 (Blackmun, J.,
dissenting)).  We concluded that the State had met its burden, in Berard, of showing “that the prison environment
presents special needs which ‘make the warrant and probable-cause requirement
impracticable.’ “  Id. at 312, 576 A.2d at 121 (quoting New
Jersey v. T.L.O., 469 U.S. 325, 351 (1985) (Blackmun, J., concurring in the
judgment)).  We based this conclusion on “the inexorable nature of prison
governance in general,” on a trial court finding that “[p]ossession
of contraband by inmates is an ongoing concern among correctional officials,”
and on the fact that prisons would be hard-pressed to fulfill their statutory
duty to “maintain security, safety and order at the correctional facilities”
without “an effective procedure for detecting contraband.”  Id. at
312-13, 576 A.2d at 121-22 (quotations omitted).  We further noted that
prisoners’ “expectation of privacy [is] considerably diminished at best.” 
Id. at 311, 576 A.2d at 121.

¶ 12.        
In our next special-needs case, State v. Richardson, we upheld
the warrantless seizure of a gun from an about-to-be-impounded
automobile at a DUI stop.  158 Vt. 635, 635, 603 A.2d 378, 378 (1992) (mem.).  Although Richardson, a brief entry
order, contains no prolonged analysis, its rationale was that the seizure was
justified by “ ‘concern for the safety of the general public who might be
endangered if an intruder removed [the gun].’ “  Id. (quoting Cady
v. Dombrowski, 413 U.S. 433, 447 (1973)). 
As we noted in Richardson, the seizure was made without benefit of the
“established departmental procedures” that governed the officers in Cady,
but the lack of such procedures was of no moment in light of the “obvious
prudence” of the Richardson officers and the “unacceptable danger to the
public at large.”  Id. at 635-36, 603 A.2d at 379.

¶ 13.        
The following year, in State v. Lockwood, we considered the
validity of a probation condition requiring a developmentally disabled sex
offender to submit to “ ‘body, clothing, [and] residential search as required.’
“  160 Vt. 547, 549, 632 A.2d 655, 658 (1993) (alteration in original). 
We concluded that “the special needs of the state in administering its
probation program create[] an exception to the warrant requirement and permit[]
a degree of ‘impingement upon privacy that would not be constitutional if
applied to the public at large.’ “ Lockwood, 160 Vt. at 559, 632 A.2d at
663 (quoting Griffin v. Wisconsin, 483 U.S. 868, 872 (1987)).  Our
narrow holding in Lockwood—that when “officers have reasonable grounds .
. . to conduct a search under the authority of a condition of probation,
Article 11 does not require a search warrant”—was explicitly premised on the
probation system’s public-protection goals and the diminished privacy rights of
probationers.  Id. at 559-60, 632 A.2d at 663. Although our
special-needs cases are limited in number, their principles guide our analysis
here.

A.  The
DNA-Database Statute is Subject to Article 11

¶ 14.        
As a threshold matter, we agree with the many courts that have held that
DNA sampling, by blood draw or by cheek swab, is subject to constitutional
protections.  See, e.g., Amerson, 483
F.3d at 77 (“It is settled law that DNA indexing statutes, because they
authorize both a physical intrusion to obtain a tissue sample and a chemical
analysis to obtain private physiological information about a person, are
subject to the strictures of the Fourth Amendment.”); United States v. Nicolosi, 885 F. Supp. 50, 55-56 (E.D.N.Y. 1995) (cheek
swab is physically intrusive to a degree sufficient to trigger Fourth Amendment
protection); Landry v. Att’y Gen., 709 N.E.2d
1085, 1090 (Mass. 1999) (DNA sampling subject to state constitutional
protections).  The initial taking of the DNA sample, either by blood draw
or by buccal swab, and the subsequent analysis,
storage, and searching of the DNA profile are independent intrusions upon
personal security that merit scrutiny under Article 11.

B.  The Existence of a “Special Need”

¶ 15.        
The State contends that the DNA statute serves several special needs:
“(1) deterrence of all criminal conduct, (2) accurate identification of
perpetrators, (3) exclusion of innocent suspects, and (4) assistance in the
identification of missing persons.”  Defendants argue that the primary
purpose of the sampling statute is articulated in the first sentence of 20
V.S.A. § 1931, which states: “It is the policy of this state to
assist federal, state, and local criminal justice and law enforcement agencies
in the identification, detection or exclusion of individuals who are subjects
of the investigation or prosecution of violent crimes.”  Accordingly,
defendants contend that the primary purpose of the statute is normal law
enforcement, and that the probable-cause and warrant requirements therefore
apply.  We conclude that the statute does serve special needs beyond
normal law enforcement.

¶ 16.        
We agree, as an initial matter, with the Supreme Court of New Jersey’s
conclusion that DNA database statutes like ours fill special needs in part
because, “[a]lthough the enumerated purposes may
involve law enforcement to some degree, the central purposes of the DNA testing
are not intended to subject the donor to criminal charges.”  State v. O’Hagen, 914 A.2d 267, 278 (N.J. 2007).  The New
Jersey court went on to clarify:

 
Here, the primary purposes of the DNA tests are to create a DNA database and to
assist in the identification of persons at a crime scene should the
investigation of such crimes permit resort to DNA testing of evidence. 
That is a long-range special need that does not have the immediate
objective of gathering evidence against the offender.

 

Id.
at 279 (citation omitted and emphasis added).  

¶ 17.        
This distinction was based on three U.S. Supreme Court special-needs
cases that mark the boundaries of the Fourth Amendment special-needs
doctrine.  The cases are: Illinois v. Lidster,
540 U.S. 419, 427-28 (2004) (upholding brief seizure of motorists at roadblock
seeking information about hit-and-run accident already known to have occurred);
Ferguson v. City of Charleston, 532 U.S. 67, 84 (2001) (drug-testing
program for pregnant women did not serve special needs; primary purpose was to
use the threat of criminal prosecution based on the test results to “force
women into treatment”); and City of Indianapolis v. Edmond, 531 U.S. 32,
44 (2000) (police checkpoint for “crime control” does not serve a special need;
Court “cannot sanction stops justified only by the generalized and ever-present
possibility that interrogation and inspection may reveal that any given motorist
has committed some crime”).  “Under these cases,” the O’Hagen
court concluded, “suspicionless searches are
unconstitutional if the immediate purpose is to gather evidence against the
individual for general crime control purposes.  On the other hand, if the
core objective of the police conduct serves a special need other than immediate
crime detection, the search may be constitutional.”  914 A.2d at 279.

¶ 18.        
Of similar import on this point are the Second Circuit cases considering
the federal, New York, and Connecticut DNA database statutes.  See United
States v. Amerson, 483 F.3d 73 (2d Cir. 2007)
(federal statute); Nicholas v. Goord, 430 F.3d
652 (2d Cir. 2005) (New York statute), cert denied, 127 S.Ct.
384 (2006); Roe v. Marcotte, 193 F.3d 72 (2d
Cir. 1999) (Connecticut statute).  The Second Circuit’s analysis of Edmond,
Ferguson, and Lidster closely parallels
the O’Hagen court’s.  See Amerson, 483 F.3d at 80-81; Goord,
430 F.3d at 663.  Lidster, as the Goord court wrote, requires

 a
more nuanced approach to law-enforcement concerns. . . .   Lidster instructs courts to examine carefully the type
of law-enforcement concern served by a particular search or seizure regime. . .
. [W]e find it crucial that the state, in collecting DNA samples, is not trying
to determine that a particular individual has engaged in some specific
wrongdoing.  Although the DNA samples may eventually help law enforcement
identify the perpetrator of a crime, at the time of collection, the samples in
fact provide no evidence in and of themselves of criminal wrongdoing, and are
not sought for the investigation of a specific crime.

 

Goord, 430 F.3d at 668-69 (quotations and citation
omitted).  As noted above, the principal evil sought to be remedied by
Article 11 and its federal and state counterparts was the issuance of general
warrants and the concomitant vesting of officers of the state with unlimited
discretion to intrude upon the privacy interests of particular
individuals of their choice without particularized suspicion, in the hope of
immediately discovering wrongdoing.

¶ 19.        
We conclude that the O’Hagen reasoning
also applies under Article 11, and that DNA sampling and analysis to assist in
identifying persons at future crime scenes is a special need beyond normal law
enforcement.  Vermont’s DNA database statute has as its stated purpose “to
assist federal, state and local criminal justice and law enforcement agencies
in the identification, detection or exclusion of individuals who are subjects
of the investigation or prosecution of violent crimes.”  20 V.S.A. §
1931.  These purposes are distinct from the normal law-enforcement
activities of investigating particular people for crimes already committed. 

¶ 20.        
Although the structure of § 1931 makes clear that identifying missing
persons is not the primary purpose of the statute, its presence highlights that
the statute is not, as a general matter, concerned with “ordinary law
enforcement.”  Rather the statute seeks to use DNA to accurately and
efficiently identify persons in a variety of contexts, including subsequent
criminal prosecutions.[8]
 These goals are beyond the normal goals of law enforcement.  We
note, finally, that the statute also serves another special need beyond those
stated in § 1931: deterrence. Although the question of whether—and to what
extent—a particular penological strategy will deter
crime is fraught with uncertainty, we think it plain that at least some
deterrent effect will accrue if felons know that their DNA has been sampled and
indexed and might someday be detected at a crime scene if they reoffend. 

C.  Special-Needs Balancing Test

¶ 21.        
Having concluded that the DNA statute serves special needs beyond normal
law enforcement, we turn to a balancing of the competing public and private
interests at stake.  See Berard, 154 Vt.
at 317, 576 A.2d at 124 (balancing the State’s need for effective prison-cell
searches against inmates’ right to be free from “unreasonably invasive or
arbitrary treatment”); O’Hagen, 914 A.2d at
279-81.  The State asserts that the public’s interests in the DNA database
and data bank are: “(1) deterrence of all criminal conduct, (2) accurate
identification of perpetrators, (3) exclusion of innocent suspects, and (4)
assistance in the identification of missing persons.”  Defendants
characterize the State’s interest as “general law enforcement” and assert that
it is outweighed by sampled individuals’ interest in keeping private the
“personal genetic traits” revealed by DNA analysis.  There are two
intrusions at issue: (1) the initial sampling by buccal
swab, and (2) the subsequent analysis, indexing, and searching of the
information obtained.

¶ 22.        
We first consider the privacy interests involved in the initial
sampling.  As noted, the record does not conclusively establish which
collection method will be employed.  The statute does mandate, however,
that the least intrusive available means be used, and the State has averred,
without opposition, that the samples will be taken by cheek swab. 
Further, although the record in these appeals is not altogether clear, at the
time of our decision in In re R.H., the
DPS was using cheek swabs to obtain DNA samples.  171 Vt. 227, 238, 762
A.2d 1239, 1247 (2000).  As the statute requires the least-intrusive
scientifically valid means of collection, it is safe to suppose that cheek
swabs remain as viable today as they were at the time of R.H. 
Accordingly, our analysis assumes the DPS will use cheek swabs to obtain
DNA.  

¶ 23.        
In R.H., we upheld the use of a nontestimonial
identification order (NTO) based on less than probable cause to compel a
suspect to submit to DNA sampling by cheek swab.  We concluded that taking
a DNA sample by that method was less intrusive than taking a blood sample, see Schmerber v. California, 384 U.S. 757, 769-70
(1966), or a pubic hair sample, see State v. Towne, 158 Vt. 607, 621,
615 A.2d 484, 492 (1992), and could therefore be justified by  reasonable
suspicion rather than probable cause in the NTO context.  In re R.H.,
171 Vt. at 234, 762 A.2d at 1244.  The suspect in R.H. was neither
incarcerated nor under any other form of supervision by the state at the time
of the order; accordingly, his expectations of privacy were undiminished. 
R.H. also highlights the different protections applicable when DNA
sampling is conducted to investigate a particular crime and potentially subject
the sampled individual to immediate criminal charges.  Although R.H.
does not answer the question before us, we find no reason to depart from our unanimous statement in R.H. that the
initial sampling is minimally intrusive.  Accord O’Hagen,
914 A.2d at 280 (“[A buccal swab] is no more
intrusive than the fingerprint procedure and the taking of one’s photograph
that a person must already undergo as part of the normal arrest
process.”).  We have also held, in Lockwood, that probationers are
subject to “ ‘impingement[s] upon privacy that would not be constitutional if
applied to the public at large.’ “ 160 Vt. at 559, 632 A.2d at 663 (quoting Griffin,
483 U.S. at 875).  The initial sampling, taken alone, does not violate
Article 11.

¶ 24.        
Defendants contend, however, that the principal intrusion into interests
protected by Article 11 occurs after the initial sampling, when the sample is
analyzed to yield a profile, and the profile is included in the database. 
See 20 V.S.A. §§ 1936-1939.  Citing Goord,
430 F.3d at 670, defendants’ principal argument is that “[t]he analysis of an
individual’s DNA reveals personal genetic traits that many people choose to
keep private” and that such analysis is a “far greater intrusion” into
protected privacy interests than the initial sampling.  The Chittenden
District Court agreed:

 
Analysis of DNA is an intrusion into personal information which many people
choose to keep private.  It is unique to the individual, and contains
information concerning the person’s medical conditions and frailties, paternity
and other familia[l] relationships.  DNA
analysis not only identifies an individual, but also members of his or her
family.  Under Article 11, Vermonters have a reasonable expectation of
privacy in their DNA.  If this were not the case, an NTO based on
reasonable suspicion would not be required before a DNA sample could be taken.

 

¶ 25.        
A few opinions lend support to defendants’ argument, envisioning an
inexorable march from DNA databases like Vermont’s
to a dystopian future of eugenics, gene-based discrimination, and other horribles worthy of Aldous
Huxley.[9] 
See, e.g., United States v. Kincade, 379 F.3d
813, 847, 851 (9th Cir. 2004) (Reinhardt, J., dissenting) (asserting that “in
the hands of an administration that chooses to exalt order at the cost of
liberty, the database could be used to repress dissent or, quite literally, to
eliminate political opposition” and that “we all have reason to fear that the
nightmarish worlds depicted in films such as Minority Report [in which
genetically altered ‘precognitives’ are able to see
into the future] and Gattaca [in which the
protagonist purchases a superior genetic identity in order to be chosen for a
mission to Saturn] will become realities” (quotation and citation
omitted)).  Similarly, a federal district court judge in Massachusetts
recently concluded that the federal DNA database statute was unconstitutional
as applied to a probationer because “all information collected will one day be
exploited.”  United States v. Stewart, 468 F. Supp. 2d 261, 280 (D.
Mass. 2007) (Young, J.).   Suffice it to say that these fears—which
are echoed in defendants’ briefs—find little foundation in the statute before
us today, which does not authorize or make possible such encroachments.[10]

¶ 26.        
Rather, what the statute authorizes is the creation, storage, and
searching of a unique alphanumeric identifier based on analysis of thirteen
locations on DNA that are not associated with any known physical trait. 
This identifier is the only information contained in each person’s database
profile, see 20 V.S.A. § 1932(4), and reveals no information about “personal
genetic traits that many people choose to keep private,” as appellants
contend.  See, e.g., Goord, 430 F.3d at
670 (“The junk DNA that is extracted has, at present, no known function, except
to accurately and uniquely establish identity.  Although science may
someday be able to unearth much more information about us through our junk DNA,
that capability does not yet exist, and, more importantly, the New York statute
prohibits such analysis.”); see also, e.g., J. Grand, Note, The Blooding of
America: Privacy and the DNA Dragnet, 23 Cardozo L. Rev. 2277, 2320 (2002)
(“By limiting the amount of genetic information included in a profile, the
CODIS database is practical for identification purposes only.”); D.H. Kaye, Two
Fallacies About DNA Data Banks for Law Enforcement, 67 Brook. L. Rev. 179,
188 (2001) (“The thirteen standard identifying loci used in [CODIS] . . . are noncoding, and none is known to correlate with any
observable traits—stigmatizing or otherwise.”).  

¶ 27.        
Like the New York statute at issue in Goord,
the statute we consider today expressly prohibits analysis of DNA samples for
any but three narrow purposes: creating a profile for inclusion in CODIS and
the state database, 20 V.S.A. § 1932(4); administrative purposes and protocol
development, if all individual identifying information is removed from the
sample, id. § 1937(a)(2); and identifying human remains, id. §
1937(a)(3).  The intrusions occasioned by these uses are minimal and, like
searching a fingerprint database, reveal nothing more than mere identity.[11]  The
dissent also relies on an article, D. Concar, What’s
in a Fingerprint, New Scientist, May 5, 2001, at 9, which is not part of
the record on appeal, see V.R.A.P. 10, and which is plainly not material a
court might properly take judicial notice of.  See Reporter’s Notes,
V.R.E. 201, and cases cited therein.  As a general matter, facts may be
noticed when they are either generally known or “capable of accurate and ready
determination by resort to sources whose accuracy cannot reasonably be
questioned.”  V.R.E. 201(b); accord Advisory Committee Notes, F.R.E.
201(b) (noting that “[a] high degree of indisputability is the essential
prerequisite” for taking judicial notice of adjudicative facts); 21B C. Wright
& K. Graham, Federal Practice & Procedure § 5106, at 204 n.27 (“[T]he
direct proof of . . . scientific publications by qualified experts would be
highly preferable to the rather chancy procedure by which a court may take
judicial notice of things about which it could easily be mistaken.” (quotation
and citation omitted)).  It would exceed our authority, and our expertise,
to determine that this single article—or any other article we might
unilaterally select—conveys the truth about the DNA sampling at issue here. 

¶ 28.        
Wrongful disclosures of DNA-based information are arguably more likely
than discriminatory misuse, but that prospect also does not render the
DNA-database statute unreasonable under Article 11.  The arguments from
potential disclosure fail because we presume that the Department of Corrections
will comply with the limitations in the regulation.  See Judicial
Watch, Inc. v. Dep’t of Health & Human Servs.,
27 F. Supp. 2d 240, 243 (D.D.C. 1998) (“The Court must
presume . . . that the Executive Branch is aware of its duty
. . . to faithfully execute the law as enacted.”); City of Marina
v. Bd. of Trustees, 138 P.3d 692, 708 (Cal. 2006) (“[T]he courts ordinarily
presume that the government . . . will comply with the law.”).  Should the
Department of Corrections or anyone else wrongfully disclose protected
information, remedies are provided by statute.  See 20 V.S.A. § 1941; supra,
¶ 6.

¶ 29.        
The dissent argues that “[i]t is no answer to the invasion of privacy permitted by
[this] opinion that the statute provides for both criminal and civil remedies
for wrongful disclosure of private information obtained pursuant to the DNA
database statute.”  Post, ¶ 67.  The concern is that the state
and federal governments “have in the past failed to protect individuals’
privacy rights when tasked with maintaining large stores of personal
information.”  Id.   There are several responses to
this.  First, we are not asked to evaluate the State’s ability to
follow the statute the Legislature enacted.  See City of Marina,
138 P.3d at 708 (courts ordinarily assume that other branches of government
will comply with the law as written).  If that were our task, and had it
been the trial court’s, the record before us would look very different than it
does, and the trial court would presumably have made some findings on the subject. 
We would not be left to rely on newspaper articles selected based on
undisclosed criteria and written largely after the record was complete
in this appeal.  See post, ¶ 67 (citing newspaper articles dated
January 30, 2007; March 9, 2006; and March 9, 2007).  Second, we decide
actual cases and controversies, not hypothetical questions.  See supra,
¶ 25 n.10 and authorities cited therein.  Thus, the possibility that the
State might accidentally or intentionally disclose genetic information in
contravention of the statute simply cannot influence our decision in this case,
where no such disclosure is alleged to have happened, or even to be likely to
happen.  We further note that misuse of information necessary to the
functions of government has not traditionally supported either expunging that
information wholesale from government records, judicial invalidation of the
statutes authorizing its collection, or imposing the warrant requirement on
those collecting the data. 

¶ 30.        
 The searches the statute authorizes
are subject to clear administrative guidelines and are performed uniformly on
all felons subject to them.  Accordingly, they do not raise the specter of
unbridled officer discretion to harass particular individuals, against which
Article 11 is a bulwark of protection.  See Welch, 160 Vt. at 91,
624 A.2d at 1116 (Johnson, J., dissenting) (“In short, this Court has permitted
warrantless regulatory searches in circumstances
evincing special needs, but only when explicit guidelines ensure that the
searches are not a pretext for singling out individuals.”); Record, 150
Vt. at 86, 548 A.2d at 424 (upholding random roadside sobriety checks because
“written police guidelines prevented arbitrary police conduct, and the scope of
the roadblock was narrowly drawn”); cf. Amerson,
483 F.3d at 82 (“[W]hat makes the government’s need to create a DNA database
‘special,’ despite its relationship to law enforcement, is (as a matter of
first principles) its incompatibility with the normal requirements of a warrant
and probable cause . . . .”).

¶ 31.        
In light of the statutory limits on the analysis of genetic information,
the post-sampling intrusion on protected privacy interests is closely akin to
that occasioned by the retention and searching of fingerprint records.  As
we noted in R.H., “[l]ike fingerprinting,
saliva sampling involves no intrusion into a person’s life or thoughts; it
[cannot] be used repeatedly to harrass; it is not
subject to abuses like the improper line-up or the third degree.”  171 Vt.
at 238, 762 A.2d at 1247. The data retained in the database serves only to
prove identity, like a fingerprint.  Accord Goord,
430 F.3d at 671. 

¶ 32.        
The information in the database, then, is not information defendants can
reasonably expect to keep private as convicted felons.  Cf. United
States v. Sczubelek, 402 F.3d 175, 184-85 (3d
Cir. 2005) (“Individuals on supervised release cannot reasonably expect to keep
information bearing on their physical identity from government records. 
Thus, for criminal offenders the privacy interests implicated by the collection
of DNA are minimal.”); Jones, 962 F.2d at 306 (“[W]hen a suspect is
arrested upon probable cause, his identification becomes a matter of legitimate
state interest and he can hardly claim privacy in it.”).  

¶ 33.        
Further, of the many methods of determining identity, DNA is more
accurate and far less susceptible to the various methods of deception employed
by wrongdoers:

It
is a well recognized aspect of criminal conduct that the perpetrator will take
unusual steps to conceal not only his conduct, but also his identity. 
Disguises used while committing a crime may be supplemented or replaced by
changed names, and even changed physical features.  Traditional methods of
identification by photographs, historical records, and fingerprints often prove
inadequate.  The DNA, however, is claimed to be unique to each individual
and cannot, within current scientific knowledge, be altered . . . . Even a
suspect with altered physical features cannot escape the match that his DNA
might make with a sample contained in a DNA bank, or left at the scene of a
crime within samples of blood, skin, semen or hair follicles.  The
governmental justification for this form of identification, therefore, relies
on no argument different in kind from that traditionally advanced for taking
fingerprints and photographs, but with additional force because of the
potentially greater precision of DNA sampling and matching methods.

 

Jones,
962 F.2d at 307.  This accuracy, and DNA’s concomitant ability to
conclusively exonerate the innocent, weigh heavily in favor of the statute.

¶ 34.        
Defendants argue that nonviolent felons like them may not be subjected
to sampling under Article 11 even if sampling of violent felons would be
permissible.  The Chittenden District Court agreed, holding that “there is
a question of ‘fit’ “ between the sampling requirements in the new statute and
the crimes these defendants committed, which the court noted would seldom
involve DNA evidence.  A similar argument was advanced and rejected in Jones.
 Id. at 308.  There, several inmates convicted of nonviolent
offenses argued, with supporting statistics, that the vast majority of cases
involving DNA evidence were murders or rapes, and that there was only a small
statistical likelihood that nonviolent offenders would later commit those
crimes.  See id. (noting that 97% of cases where DNA evidence was
used were murders or rapes, and that less than 1% of nonviolent offenders are
later arrested on murder or rape charges).  The Court of Appeals for the
Fourth Circuit agreed with the inmates that the state’s “interest in DNA
testing is significantly more compelling with regard to those felons convicted
of violent crimes than those not,” but concluded that “[t]he effectiveness of
the [state’s] plan, in terms of percentage, need not be high where the
objective is significant and the privacy intrusion limited.”  Id. 
(citing Mich. Dep’t of State Police v. Sitz,
496 U.S. 444, 454-55 (1990) (upholding DUI roadblock despite arrest rate of
1.5%)); Bell v. Wolfish, 441 U.S. 520, 559 (1979) (upholding searches of
pretrial detainees; only single instance where inmate caught with
contraband)).  We agree with that analysis, and note also that the
statute’s purposes go beyond the mere identification of perpetrators and extend
to exoneration of the innocent and identification of missing persons, both of
which purposes are served regardless of the violence of the underlying offense.

¶ 35.        
In summary, we conclude that the DNA sampling statute does not offend
Article 11 as applied to nonviolent felons, whether they are incarcerated or
not.  The statute serves special needs beyond normal law enforcement and
advances important State interests that outweigh the minimal intrusions upon
protected interests.  

The judgment of the Chittenden
District Court is reversed, and the judgment of the Addison District Court is
affirmed.      

 

           
                                                           
FOR THE COURT:

 

 

           
                                                                       
____________________________

Chief Justice

 

 

¶ 36.        
JOHNSON, J., dissenting.   A generation ago, the late
Justice William O. Douglas presciently stated: “The privacy and dignity of our
citizens is being whittled away by sometimes imperceptible steps.  Taken
individually, each step may be of little consequence.  But when viewed as
a whole, there begins to emerge a society quite unlike any we have seen—a
society in which government may intrude into the secret regions of man’s life
at will.”  Osborn v. United States, 385 U.S. 323, 343 (1966)
(Douglas, J., dissenting and concurring).  This case, involving as it does
the need to maintain constitutional values of privacy while allowing law
enforcement to take full advantage of new technologies for solving crimes,
starkly raises the concern addressed by Justice Douglas.  

¶ 37.        
The statute under review authorizes the State to extract and to maintain
forever a DNA sample from any person convicted of a felony.  All
defendants in this case have been duly convicted of such crimes and are,
therefore, subject to the statute.  They have refused to give a sample of their
DNA, asserting that the statute violates their privacy rights under Article 11
of the Vermont Constitution.  As convicted felons, defendants may evoke
little sympathy when they seek to challenge the pains and penalties that stem
from their guilt.  And it is well-established that conviction for a felony
necessarily results in certain diminutions in one’s privacy rights.  These
considerations, however, must not deter us from our duty to fully uphold the
constitutional rights of all of the people, for, as Justice Douglas so
insightfully observed, if we fall into the habit of tolerating small assaults
on our privacy, on the ground that in and of itself each seems inconsequential
to society at large, we will eventually reach a condition in which we have
little or no privacy at all.  

¶ 38.        
We are asked to decide whether the taking, the perpetual maintenance and
the future analysis of DNA samples, involuntarily taken from individuals for
the sole reason of their conviction of certain crimes, violates Article 11 of
the Vermont Constitution.  Conceptually, this is a matter of the law of
search and seizure.  In my judgment, the majority has given us the wrong
answer to the question presented, and its analysis is wholly inadequate for the
important task before the Court.  Because I believe that our jurisprudence
plainly requires a different result, I respectfully dissent.

¶ 39.        
Before turning to the precise legal question involved, it is important
to bear in mind the context in which the DNA database statute was passed. 
The availability of DNA evidence has enhanced forensic investigations of
certain kinds of violent crimes, and most notably, has served to exonerate
people wrongfully convicted through processes that appellate courts have
nevertheless adjudged as fair.  See P. Monteleoni,
DNA Databases, Universality, and the Fourth Amendment, 82 N.Y.U. L. Rev.
247, 253 (2007).  Although its significance as evidence in other crimes is
doubtful,[12]
DNA evidence has come to be seen as a panacea for solving crimes, especially
past crimes where leads have grown cold.   Hence, federal and state
statutes have been passed permitting the collection of DNA from convicted
felons and, in some cases, even mere arrestees, without requiring any showing
of the individualized suspicion ordinarily necessary before the government may
constitutionally undertake a search.  See T. Simoncelli
& S. Krimsky, A New Era of DNA Collections: At
What Cost to Civil Liberties?, at 4-6 (2007) available at http://www.acslaw.org/node/5338.

¶ 40.        
The history of DNA database statute reveals that, while databases were
first limited, as they were in Vermont, to violent felons, many databases have
been expanded to include all felons, juveniles, some misdemeanants, and even
arrestees.  Rothstein & Talbott, supra,
at 153 (“[T]he success of [DNA] databases in solving violent crimes provided
the impetus for Congress and state legislatures to expand the scope of the
databases with little critical examination of each expansion’s value to law
enforcement or cost to privacy and civil liberties”).  Indeed, the statute
before us in this case expanded DNA collection from violent felons to all
felons, and a bill has recently been introduced in the Vermont Legislature to
extend the reach of the database to arrestees.  See H.181, 2007-2008 Gen. Assem., Bien. Sess. (Vt. 2007)
(expanding DNA database to certain classes of arrestees).  If that bill is
enacted, anyone arrested on felony charges, including those persons who may be
entirely innocent or whose identity has been mistaken, would be subject to the
invasion of privacy now sanctioned against all convicted felons.[13]  Whether such an expanded database
would be constitutional under Article 11 of the Vermont Constitution depends on
the same analysis that the majority misapplies today to the statute requiring
all felons to provide DNA samples. That is precisely why this case is so
important to us all.

¶ 41.        
The State, and every court to consider the issue, concedes that the
taking of a DNA sample involves an initial search, that the subsequent analysis
of the individual’s DNA material is another search, and that both of these
searches are subject to constitutional requirements.  To pass constitutional
muster, a search must either be supported by probable cause and a warrant or be
subject to one of the limited exceptions to the warrant rule.  State v.
Bauder, 2007 VT 16, ¶ 14, ___ Vt. ___, 924 A.2d
38; State v. Saava, 159 Vt. 75, 86, 616 A.2d
774, 780 (1991).   As we said in Saava,


as
a matter of constitutional policy, a warrant requirement is not a starting
point for deriving exceptions that balance citizens’ interest in privacy
against law enforcement’s interest in expeditious searches.  Rather, it is
the balance reached by the constitutional drafters . . . .

 

159 Vt. at 85-86, 616 A.2d at 780.
Because the warrant and probable cause requirements set a standard of
reasonableness, we have departed from these basic principles only when exigent
circumstances were present or when special needs beyond the ordinary needs of
law enforcement demanded an exception.  See State v. Berard, 154 Vt. 306, 310-11, 576 A.2d 118, 120-21
(1990) (“[T}his Court . . . abandon[s] the warrant and
probable-cause requirements, which constitute the standard of reasonableness
for a government search that the Framers established, only in those exceptional
circumstances in which special needs, beyond the normal need for law
enforcement, make the warrant and probable-cause requirement impracticable.”
(quotation omitted)); see also State v. Welch, 160 Vt. 70, 78-79, 624
A.2d 1105, 1110 (1992).  In other words, if the government is engaged in
the ordinary business of law enforcement, such as crime detection, it must have
a warrant to infringe on individual privacy rights.

¶ 42.        
Thus, the constitutional problem presented by the DNA database statute
is how to fit the statute within an exception to the warrant requirement. 
In my view, it cannot be done.[14] 
Some courts have done it by finding the government’s interest in obtaining the
DNA of persons within the corrections system to be a special need beyond the
ordinary detection of crime.  See, e.g., Nicholas v. Goord, 430 F.3d 652, 668-69 (2d Cir. 2005); Greene
v. Berge, 354 F.3d 675, 677-79 (7th Cir. 2004); United States v. Kimler, 335 F.3d 1132, 1146 (10th Cir. 2003). 
Many courts, including the overwhelming majority of federal circuit courts,
have been unable to overlook the “centrality of law enforcement objectives” in
these statutes and have analyzed the question using a totality of circumstances
test to justify departure from the warrant rule.  United States v. Weikert, 504 F.3d 1, 8-10 (1st Cir. 2007) (recognizing
that majority of federal circuit courts apply a “totality of the circumstances”
test to DNA database statutes, including the Third, Fourth, Fifth, Eighth,
Ninth, Eleventh and D.C. Circuits).  Under that test, and after the United
States Supreme Court decision in Samson v. California, the privacy
rights of prisoners, probationers and conditional releasees
are reduced to nil such that there is nothing left to balance against any
articulated government interest.[15]
 547 U.S.
843 (2006).  Under our own jurisprudence, however, there must first
be a special need beyond general crime control to allow courts to engage in
balancing individual privacy interests against the government’s interest, and
second, there must be a nexus between the government’s interest and the
restriction on privacy rights.  See State v. Lockwood, 160 Vt. 547,
556, 632 A.2d 655, 661 (1993) (probation conditions allowing for warrantless searches must be “supported by the findings and
[be] narrowly tailored to fit the circumstances of the individual probationer”
with respect to the probationer’s rehabilitation goals and public safety
concerns (quotation omitted)).  The DNA statute, as applied to the
nonviolent felons in this case, does not meet either prong of our test.  

¶ 43.        
I begin with the statute and its purpose, as articulated by the
Legislature in its preamble to the original statute:

 
It is the policy of this state to assist federal, state and local criminal
justice and law enforcement agencies in the identification, detection or
exclusion of individuals who are subjects of the investigation or prosecution
of violent crimes.  Identification, detection and exclusion may be
facilitated by the DNA analysis of biological evidence left by the perpetrator
of a violent crime and recovered from the crime scene. The DNA analysis of
biological evidence can also be used to identify missing persons.

 

20 V.S.A. § 1931 (effective April
29, 1998).  The original purpose remains unchanged, but the law now
requires that every person convicted of a designated crime, including
nonviolent felonies, whether in the custody of the Department of Corrections,
on probation, parole or serving a supervised community sentence, submit a DNA
sample.  Id. § 1933 (Cum. Supp. 2007).  Designated crimes
include felonies, an attempt to commit a felony, or any other offense resolved
by plea agreement, if as part of the plea agreement, the original charge was a
designated crime and probable cause was found by the court.  Id. §
1932(12).  Thus, under the statute it is the felon’s status that compels
the sample rather than any individualized suspicion that a particular felon has
committed a crime in the past or will commit a crime in the future.  

¶ 44.        
The primary purpose of the statute is straightforward—to identify
suspects who may have committed crimes or may at some indefinite future point
commit crimes.  Indeed, this purpose was obvious in the legislative
history, during which the Legislature heard from the FBI, local law
enforcement, and parents of a violent crime victim, among others. 
Vermont’s statute is based on the federal DNA Act, which authorizes extraction
of DNA samples from individuals convicted of a qualifying federal offense for
entry into the FBI’s Combined DNA Index System (CODIS)—”a massive, centrally
managed database including DNA profiles from federal, state, and territorial
DNA collection programs, as well as profiles drawn from crime-scene
evidence.”  Weikert, 504 F.3d at
3-4.  The mission statement of CODIS, which is incorporated by reference
in the Vermont DNA database statute, explicitly states that it is an “effective
tool for solving violent crimes” and that it was formed in 1990 “for law
enforcement purposes.”  Id. at 10 (quotation omitted).  The Vermont bill was promoted
by its advocates as an important national law enforcement tool, and the
Legislature’s statement of purpose reflects that goal.[16]  Although the State has articulated
other legitimate uses of the database under the statute, it cannot reasonably
be argued that the primary purpose of collection is other than crime
detection.  And while the legislative purpose is an obviously valid one,
the means to the end must nonetheless pass constitutional muster.

¶ 45.        
Nothing in our Article 11 jurisprudence overcomes the basic fact that
the State cannot articulate a special need to collect DNA samples from all
felons.  Previously, we have found special needs in two contexts that are
relevant here—invasions on the privacy rights of prison inmates and of
probationers.[17] 
Our controlling precedent is State v. Berard,
154 Vt. 306, 576 A.2d 118, 121 (1990), in which we recognized for the first
time that a special need going beyond ordinary law enforcement could support a
different constitutional analysis for determining the reasonableness of a
search undertaken without probable cause or a warrant.  See O’Connor v.
Ortega, 480 U.S. 709, 741 (1987) (Blackmun, J., dissenting) (quoting New
Jersey v. T.L.O., 469 U.S. 325, 351 (1985)).   In Berard, a prison inmate was charged with possession
of drugs after prison officials conducted a routine, random and suspicionless search of his cell without a
warrant.   In upholding the search, we adopted a two-part test, in
which a balancing test was substituted for the warrant and probable-cause
requirement.  

¶ 46.        
To trigger the balancing test, the State first had to demonstrate that
its ability to maintain institutional security presented a special need that
rendered the warrant and probable-cause requirements impracticable.  Berard, 154 Vt. at 311-12, 576 A.2d at 121-22. 
We recognized that the prison environment was unique, and that the State’s
objective in operating an institution free of contraband of all kinds,
including dangerous weapons, was likely to be substantially hindered by the
inability to conduct random searches.[18] 
Id. at
312-13, 576 A.2d at 121-22.  

¶ 47.        
Once we determined that a significant special need allowed a balancing
test to be substituted for a warrant and probable cause, we proceeded to weigh
the State’s “ ‘paramount interest in institutional security’ against the
inmates’ residuum of privacy rights.”  Id. at 313, 576 A.2d at
122.  We rejected the State’s position that we analyze the constitutional
question as if prison inmates had no reasonable expectation of privacy, such
that any official conduct was reasonable.  Id. at 310-12, 576 A.2d
at 120-21; cf. Hudson v. Palmer, 468 U.S. 517, 526 (1984) (holding that
under Fourth Amendment, prisoners have no reasonable expectation of privacy in
their cells).  Although privacy rights of prisoners are diminished, we
noted they are not nonexistent.  Berard,
154 Vt. at 313, 315 n.4, 576 A.2d at 122, 123 n.4 (“though his rights may be
diminished by the needs and exigencies of the institutional environment, a
prisoner is not wholly stripped of constitutional protections” (quotation
omitted)).  Nonetheless, the privacy interest of the defendant in Berard was overcome by the State’s interest because
the searches were undertaken as part of a random policy that served broad
objectives, and did not arbitrarily or specifically target him.

¶ 48.        
We applied a similar line of reasoning in State v. Lockwood, 160
Vt. 547, 632 A.2d 655 (1993), in considering a blanket probation condition that
permitted warrantless searches of a probationer’s
home and person.  We found the probation condition overbroad in that it
did not recognize the probationer’s right of privacy, one that was greater than
that of the prison inmate in Berard, but
upheld the search because the officers had “reasonable grounds” to support it
prior to the search, and the probation condition restricting the probationer’s
constitutional rights was individually and narrowly tailored to meet the goals
of his rehabilitation and the protection of the public.  Lockwood,
160 Vt. at 558, 632 A.2d at 662.  We stated that “if a probation term
provides for warrantless searches and the terms of
probation are narrowly tailored to fit the circumstances of the individual
probationer, the . . . ‘reasonable grounds’ standard strikes the proper balance
between probationer privacy rights and public protection concerns.”  Id.
at 559, 632 A.2d at 663.  Therefore, outside the prison walls, the
government’s burden to overcome even the diminished privacy rights of a
probationer demands a nexus between the special need and the warrantless intrusion, and individualized suspicion.  

¶ 49.        
The majority relies on the special-needs doctrine, arguing that the
collection of DNA for inclusion in a law enforcement database is not an
ordinary law enforcement purpose, and that the protections of Article 11 may
therefore be overlooked as impracticable.   Although our law is
considerably different from federal law and that of other states, the majority
reaches this conclusion by accepting the analysis of the Supreme Court of New
Jersey in State v. O’Hagen, 914 A.2d 267 (N.J.
2007).  In O’Hagen, the court concluded
that the primary purpose of the DNA tests is to create a DNA database to assist
in the future resolution of crimes, and because it is a long-range special need
that does not have the “immediate” objective of gathering evidence against the
offender, the statute does not impermissibly target individuals without
reasonable suspicion.  914 A.2d at 278.  The majority also accepts
the special-needs analysis of the Second Circuit Court of Appeals in Nicholas
v. Goord, interpreting the New York statute as presenting
a more “nuanced approach to law-enforcement concerns.” 430 F.3d 652, 668 (2d
Cir. 2005).  The court in Goord concluded
that DNA samples are simply an information-gathering tool that may eventually
help law enforcement identify the perpetrator of a crime, but because they do
not do so immediately at the time of collection, the collection is not sought
for the investigation of a specific crime.  Id. at 667-68.  

¶ 50.        
First, the reasoning on which the majority opinion relies completely
overlooks that DNA collection from persons recently convicted may
identify—immediately, or as soon as the analysis and database check is
completed—a suspect in an old, unsolved crime, and that such person will be
prosecuted as a result of the identification.  This is ordinary detection
of crime for which the majority mounts no special-needs justification.  

¶ 51.        
Second, even if the DNA collected is analyzed and awaits a possible
match with a future crime, the time distinction increases the constitutional
problem, rather than decreases it.  If no current crime needs solving, the
government’s need to use extraordinary procedures that abandon the warrant and
probable-cause requirement is difficult to justify.  The State’s interest
is obviously weaker if it is gathering information for crimes that have not yet
been committed.  Cf. Illinois v. Lidster,
540 U.S. 419 (2004) (upholding roadblock on grounds that stop’s objective was
to help find the perpetrator of a specific and known crime, not of unknown
crimes of a general sort).  Contrary to the majority’s assertion,
cataloguing DNA for future prosecutions, for crimes not yet committed, is
precisely the kind of evil sought to be remedied by Article 11—the intrusion on
the privacy of individuals for whom no reasonable suspicion of wrongdoing can
be articulated.[19] 
Collecting DNA for crimes that may never be committed, to further some sort of
general deterrence goal, undeniably serves a general law enforcement purpose.[20]   

¶ 52.        
Third, the fact that DNA statutes merely allow the collection of data
for identity purposes begs the special-needs question.  See Goord, 430 F.3d at 669 (defining governmental
interest in DNA database as “obtaining identifying information from convicted
offenders and keeping a record of such information”).  The question is
whether the identifying information is sought for ordinary law enforcement
purposes. [21]  Our constitution makes no distinction between evidence
gathered for identification of suspects and other kinds of evidence.  If
the police decided to conduct a dragnet by demanding the DNA of every white
male in a certain neighborhood in an attempt to “merely identify” the
perpetrator of a violent crime, that action could not be carried out
constitutionally as a special need.  

¶ 53.        
In short, the DNA statute allows the state to collect DNA from individuals
for the express purpose of identifying them as either the perpetrator of a past
crime, or the perpetrator of a future crime, so that they may be
prosecuted.  As many courts and commentators have now recognized, calling
the collection of DNA under the database statutes a special need of law
enforcement is like trying to fit a square peg into a round hole.  See,
e.g., Weikert, 504 F.3d at 9-10; J. Rikelman, Justifying Forcible DNA Testing Schemes Under
the Special Needs Exception to the Fourth Amendment: A Dangerous Precedent,
59 Baylor L. Rev. 41, 65-68 (2007); Monteleoni, supra,
at 262-67.

¶ 54.        
The majority’s analysis plainly fails to meet the first requirement of
our own precedent in Berard—to demonstrate
that a credible special need exists to abandon the warrant and probable-cause
requirement.  Its analysis is inadequate to the important task before the
Court.  

¶ 55.        
Even if I were to accept that the collection of DNA is a special need,
however, the majority has not shown that there is a nexus between the State’s
special need and the warrantless intrusion on
appellants’ rights, or that the intrusion is narrowly tailored to accomplish
those ends.  See Lockwood, 160 Vt. at 556, 632 A.2d at 661. 
Thus, its conclusion that the State’s interest in the DNA database statute
outweighs the important privacy interests that nonviolent felons maintain in
their DNA is entirely unsupported.  

¶ 56.        
The State has the burden to demonstrate a nexus between the collection
and profiling of DNA samples from all convicted, nonviolent felons and its
interest in identifying perpetrators of future crimes, deterring criminal
activity, and preventing recidivism.  As we have held, the State’s
interest in both rehabilitating those in the corrections system and protecting
the public from convicted criminals is reasonably furthered by activities such
as random prison-cell searches and searches of probationers’ homes based on
reasonable suspicion, and thus, there is a sufficient nexus to depart from the
warrant and probable-cause requirements.  Here, there is no similar
connection between the State’s interest in penalizing, controlling, or
rehabilitating convicted felons and collecting, profiling, and repeatedly
searching their unique genetic material, nor does the State even attempt to
argue that there is.  

¶ 57.        
The State’s general interest in preventing crime is no more furthered by
collecting the DNA of all convicted felons than it would be by sampling the DNA
of all Vermont citizens.   As the District Court, Judge Levitt presiding, saliently concluded in its ruling on the
constitutionality of the DNA database statute:

[T]here
is a question of “fit.”  Identity is never at issue in the type of crimes
in which the above-named defendants were convicted, that is false pretenses,
drug possession, or driving while intoxicated.  It is crimes against
persons where DNA identification and exclusion is most relevant, not the
non-contact crimes involving possession, intoxication or larceny. 

 

To reach the majority’s
conclusion, one therefore has to accept the proposition that, although identity
is generally not at issue in nonviolent felonies, the fact that the State holds
the DNA of a nonviolent felon will deter that person from committing crimes in
the future.  Not even the majority finds that a viable proposition. 
See ante, ¶ 20.  

¶ 58.        
Given the weak nexus between the State’s means and its ends, the
majority has not shown that the State’s interest in solving or deterring future
crimes outweighs defendants’ privacy interests in their DNA.  See Berard, 154 Vt. at 311, 576 A.2d at 121; Lockwood,
160 Vt. at 556-59, 632 A.2d at 661-63.  Even the warrantless
search in Lockwood, which intruded only on possessory
interests, was supported by “reasonable grounds” in light of the residuum of
privacy accorded to a probationer.  160 Vt. at 558-59, 632 A.2d at
662-63.  Unlike Lockwood, the majority here gives short shrift to
the significant privacy interests involved. 

¶ 59.        
Each of us has a reasonable expectation of privacy in our unique genetic
make-up.  If we did not, there would be no constitutional question before
us.  While a convicted felon’s privacy interest in his home, or possessory interest in his belongings, may be temporarily
diminished given the constraints and goals of the corrections system, he cannot
be said to have a similarly lessened expectation of privacy in his unique
genetic profile.  DNA analysis has the potential to reveal a panoply of
private genetic information, including physical and medical characteristics,
genealogy, and predisposition to disease—none of which bears any relation to
the penal, rehabilitative or administrative goals of the corrections
system.  

¶ 60.        
To be sure, the privacy rights of convicted felons within the
corrections system, whether prisoners, probationers or parolees, are
necessarily diminished.[22] 
As the majority points out, those currently within the corrections system
cannot be said to have a reasonable expectation of privacy in their physical
identity.  Indeed, convicted criminals make their identity a public
concern by committing a crime, and the government must have identifying
information to administer the criminal justice system.  This lack of
privacy in the mere fact of one’s identity, however, does not reasonably extend
to the extraction, analysis, indefinite storage and repeated law enforcement
searches of convicted felons’ DNA without seriously undercutting the
constitutional right of citizens to be free in their persons.   

¶ 61.        
The majority attempts, as have other courts, to liken DNA profiling to
fingerprinting, and thereby deemphasize the important privacy interests
implicated by the DNA database statute.  There are, however, critical differences
between the two that we must bear in mind in our analysis of the database
statute.  To begin, fingerprints are regularly exposed to the outside
world and cannot be manipulated to reveal private information beyond
identity.  Within the corrections system, fingerprinting is undertaken as
part of the routine booking procedure to establish the identity of the person
taken into custody, ascertain the person’s criminal history and outstanding
warrants, if any, and aid in the apprehension of escaped prisoners.  United
States v. Olivares-Rangel, 458 F.3d 1104, 1113 (10th Cir. 2006).  

¶ 62.        
 DNA samples serve a different purpose.  They must be analyzed
to create a unique profile useful to law enforcement in identifying criminal
suspects, and in the process of that analysis, the intimate details of one’s
genetic make-up are revealed, exposing felons to the type of governmental abuse
of privacy that Article 11 is intended to thwart.  The majority claims
that the statute simply authorizes “the creation, storage, and searching of a
unique alphanumeric identifier based on analysis of thirteen locations on ‘junk
DNA’—i.e. DNA not associated with any known physical trait.”  Ante,
¶ 26.  As scientific advancements in the field of genetics continue,
however, the likelihood that increasingly private information can be gleaned
from the seemingly innocuous DNA profiles expands.  In fact, while the
thirteen loci at which DNA samples are measured were once widely believed to be
“junk DNA,” scientists have in recent years discovered that DNA profiling “can
reveal probabilistic information about one’s ethnicity and gender.”  Monteleoni, supra, at 256.  Furthermore, there
is strong scientific evidence to suggest that the profiles may carry
information about individuals’ genetic predisposition to certain diseases.[23]  See id.; D. Concar, What’s in a Fingerprint?, New
Scientist, May 5, 2001, at 9.  Thus, DNA profiling involves a
significantly greater intrusion of privacy than fingerprinting and other
methods of criminal detection and identification. 

¶ 63.        
Even if I agreed that DNA profiling, like fingerprinting, provides no
more information than a unique identifier, the critical difference is in the
way the identifying information is used.  No one here is contending that
the State collects DNA samples solely for administrative purposes, such as
those underlying the routine fingerprinting by corrections.  Rather, the
explicit purpose of collecting DNA samples from felons—potentially long after
their identity has been established by fingerprinting—is to use them
indefinitely to investigate past or as-yet-uncommitted future crimes.

¶ 64.        
Finally, the majority’s reliance on In re R.H. for the
proposition that DNA sampling, by saliva swab, involves no intrusion greater
than that engendered by fingerprinting is misplaced.  171 Vt. 227, 238,
762 A.2d 1239, 1247 (2000).  In that case, the view that a cheek swab was
a minimal intrusion of privacy was appropriate in light of the safeguards
present—reasonable suspicion of the defendant’s involvement in a crime and
judicial review leading to a nontestimonial order
(NTO).  Furthermore, we recognized in R.H. that protections such as
destruction of nonmatching profiles analyzed pursuant
to an NTO might be prudent, and requested that the Advisory Committee on the
Rules of Criminal Procedure consider adding such safeguards.  Id.
at 238-39, 762 A.2d at 1247-48.  While the Advisory Committee determined
that such protections were more appropriate for legislative action and the
Legislature has as yet failed to act on the matter, the privacy issues
implicated were, in the very least, brought to the forefront.  See
Reporter’s Notes, 2006 Amendment, V.R.Cr.P.
41.1.  Today, the majority fails entirely to consider the implications of
indefinitely storing DNA profiles which, unlike profiles analyzed pursuant to
an NTO, are extracted without individualized suspicion or judicial oversight
and based only on the status of the individuals providing the samples.  

¶ 65.        
In comparison to the significant privacy rights at risk in DNA profiling
and data-banking, the State’s general interest in adding to its arsenal of
investigative tools is weak at best.  To the extent that the DNA database
is intended to solve future crimes that have not yet been committed, the State
has little interest in invading the privacy rights of nonviolent felons. 
To the extent that it is used to solve past crimes, there is already a
constitutional mechanism in place for obtaining DNA samples from suspects on
the basis of some individualized suspicion and judicial review.  See R.H.,
171 Vt. at 238-39, 762 A.2d at 1247-48.  Nor is the statute narrowly
tailored to meet its goals, as any future crimes likely to be committed by
recidivist nonviolent offenders are unlikely to be solved by DNA
evidence.  

¶ 66.        
In any event, there are no exigencies involved in the use of DNA
profiling to investigate past or future crimes.  In the case of searches
of prison cells or probationer’s homes, contraband or other evidence of
criminality could be concealed or destroyed in the time it takes to obtain a
warrant.  DNA, on the other hand, can neither be destroyed nor
concealed.  The privacy interests of convicted felons in their unique
genetic code far outweigh the governmental interest in collecting, storing and
searching the DNA of an entire class of individuals for the investigation of
as-yet-uncommitted crimes.  Thus, the State’s inability to demonstrate
that its interests in creating and maintaining the investigative tool should
overcome the important privacy interests at stake, and its wholesale failure to
prove a sufficient nexus between its goals and its methods—sampling of all
nonviolent felons—further militate against abandoning Article 11
protections.    

¶ 67.        
It is no answer to the invasion of privacy permitted by the majority’s
opinion that the statute provides both criminal and civil remedies for wrongful
disclosure of private information obtained pursuant to the DNA database
statute.  See 20 V.S.A. § 1941.  The delicate nature of the genetic
information at stake here and its availability not only to state but federal
law enforcement officials dictates against after-the-fact remedies and in favor
of pre-search constitutional safeguards.  Unfortunately, our nation’s
history provides stringent warnings against unabashedly entrusting government
with sensitive information about our citizenry.  Whether intentionally or
accidentally, both our state and federal governments have in the past failed to
protect individuals’ privacy rights when tasked with maintaining large stores
of personal information.  Only recently, state officials announced a major
breach of the Vermont Offices of Child Support computer system, providing hackers
with access to the names, social security numbers and bank account information
of nearly 70,000 state residents.  D. Gram, State Was Warned of
Potential Computer Security Breach, Assoc. Press, January 30, 2007. 
In response, a computer security expert noted the state’s carelessness in
storing the data on a computer with such limited security protection.  Id. 
Regardless of the state’s diligence in maintaining the state DNA database, the
fact remains that the statute at issue allows for the dissemination of profiles
for storage and use in the federal CODIS. The federal government’s track record
where protection of sensitive information is concerned is even less reassuring
than the state’s.  Not only have its security measures been compromised on
numerous occasions, there is ample evidence of its affirmative misuse of
private data for political purposes.  For example, as recently as March
2006, the Justice Department reported that the FBI had found hundreds of
violations of its own wiretapping and other intelligence-gathering
procedures.  E. Lichtblau, Justice Dept.
Report Cites Intelligence-Rule Violations by F.B.I., N.Y. Times, March 9,
2006, at A21.  More disturbingly, only a year later, the Justice
Department’s inspector general issued a scathing report criticizing the FBI’s
unauthorized use of administrative subpoenas to obtain thousands of telephone,
business and financial records of American citizens under the guise of national
security.  D. Johnston & E. Lipton, U.S. Report to Fault Wide Use
of Special Subpoenas by F.B.I., N.Y. Times, March 9, 2007, at A1. 
Given this history, I am not persuaded that we should rely on statutory
penalties as a meaningful substitute for constitutional safeguards. 

¶ 68.        
The majority scoffs at the notion that DNA database statutes presage
futuristic societies like that portrayed in the movie Gattaca
(Columbia Pictures Corp. 1997), in which the government maintains a DNA
database of all citizens and classifies them as “valid” or “invalid,” takes
cheek swabs at roadblocks for instantaneous identity verification, and
privileges those citizens whose DNA has the qualities it considers
desirable.  But I would not take this threat to our liberties so
cavalierly.  Compulsory DNA testing has steadily expanded in scope. 
Proposals for further expansions are under active consideration, including
expansions that target entirely innocent citizens.  More ominously, there
is nothing in the logic of the majority opinion that will prevent the
state from requiring DNA testing of every single one of us.  After today,
one may ask, what is now the constitutional objection to testing every child at
birth in an effort to aid in the identification or recovery of missing
children?  Every applicant for a state or federal job, or for a job with a
government contractor?  Every person arrested, whether guilty of some
infraction or entirely innocent of wrongdoing?  As the majority now
defines special need, one can easily think of legitimate reasons for testing
virtually everyone; and what we have heretofore required as a valid connection
between the special need and the privacy invasion involved in a warrantless search may now apparently be satisfied by the
flimsiest of justifications, if any is needed at all.

¶ 69.        
It is too easy to dismiss a challenge to privacy presented by convicted
felons as one that deserves only cursory consideration.  The narrow
context of the inquiry tends to mask the larger threat to liberty.  But
even if we are justified in holding a lessened concern for these individuals,
they threaten soon to become everyman.  We will then have only ourselves
to blame for falling within the injunction voiced by one of the most revered of
the nation’s founders:  “They that can give up essential liberty to obtain
a little safety deserve neither liberty nor safety.”  Benjamin Franklin,
Historical Review of Pennsylvania (1759). 

¶ 70.        
I am authorized to state that Judge Devine joins this dissent.

 


  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
 Associate
 Justice
 
  











[1] 
We discuss the nature of the information stored in CODIS and the state’s
database in more detail infra, ¶ 26.

 





[2] 
On appeal, this Court reversed one of Martin’s convictions.  See State
v. Martin, 2007 VT 96, ¶ 56, ___ Vt. ___, ___ A.2d ___.  That reversal
has no impact on this opinion.





 

[3]  None
of these defendants’ crimes would have subjected them to sampling under the
pre-2005 version of the statute.  See 20 V.S.A. § 1932 (2000). 
Although we need not reach the question today, this opinion’s reasoning would
apply with even greater force to violent felons subject to sampling under the
prior version of the statute.

 





[4] 
The State contends that the hearing authorized by 20 V.S.A. § 1935(b) is
limited solely to the “issues described in [§ 1935(c)]” and accordingly may not
include the constitutional challenges raised here.  We rejected this
contention in State v. Wigg, explicitly
stating that “a defendant may challenge the constitutionality of the sampling
statute itself at the sampling hearing.”  2007 VT 48, ¶ 5 n.3, ___ Vt.
___, 928 A.2d 494 (mem.).

 





[5] Of the many courts that have reviewed
DNA-database statutes, some have used a general balancing (or totality of the
circumstances) analysis, while others have engaged in a special-needs
analysis.  The general-balancing cases include: United States v. Weikert, 504 F.3d 1, 5 (1st Cir. 2007); United
States v. Kraklio, 451 F.3d 922, 924 (8th Cir.
2006); Johnson v. Quander, 440 F.3d 489, 494
n.1 (D.C. Cir. 2006); United States v. Sczubelek,
402 F.3d 175, 184 (3d Cir. 2005); Padgett v. Donald, 401 F.3d 1273, 1278
n.4 (11th Cir. 2005); United States v. Kincade,
379 F.3d 813, 831 (9th Cir. 2004); Groceman
v. United States Dep’t of Justice, 354 F.3d 411, 413 (5th Cir. 2004) (per curiam); Boling v. Romer,
101 F.3d 1336, 1340 (10th Cir. 1996); Jones v. Murray, 962 F.2d 302, 307
(4th Cir. 1992); In re Maricopa County Juvenile Action, 930 P.2d 496,
501 (Ariz. Ct. App. 1996); Polston v. State,
201 S.W.3d 406, 409 (Ark. 2005); People v. King, 99 Cal. Rptr. 2d 220, 228 (Ct. App. 2000); L.S. v. State,
805 So. 2d 1004, 1007 (Fla. Dist. Ct. App. 2001); People v. Calahan, 649 N.E.2d 588, 592 (Ill. App. Ct. 1995); Landry
v. Att’y Gen., 709 N.E.2d 1085, 1092 (Mass.
1999); Cooper v. Gammon, 943 S.W.2d 699, 704 (Mo. Ct. App. 1997); Gaines
v. State, 998 P.2d 166, 172 (Nev. 2000); State ex rel.
Juvenile Dep’t v. Orozco, 878 P.2d 432, 435-36 (Or. Ct. App. 1994); State
v. Scarborough, 201 S.W.3d 607, 616-17 (Tenn. 2006); Johnson v.
Commonwealth, 529 S.E.2d 769, 779 (Va. 2000); Doles v. State, 994
P.2d 315, 319 (Wyo. 1999).  

 

           
The special-needs cases include: United States v. Amerson,
483 F.3d 73, 78 (2d Cir. 2007); Nicholas v. Goord,
430 F.3d 652, 667 (2d Cir. 2005), cert. denied, 127 S.Ct.
384 (2006); Green v. Berge, 354 F.3d 675, 679 (7th Cir. 2004); United
States v. Kimler, 335 F.3d 1132, 1146 (10th Cir.
2003);  Roe v. Marcotte, 193 F.3d 72, 78
(2d Cir. 1999); State v. Martinez, 78 P.3d 769, 774 (Kan. 2003); State
v. O’Hagen, 914 A.2d 267, 277 (N.J. 2007); State
v. Steele, 802 N.E.2d 1127, 1137 (Ohio 2003); Dial v. Vaghan, 733 A.2d 1, 6-7 (Pa. Commw.
Ct. 1999); In re D.L.C., 124 S.W.3d 354, 373 (Tex. App. 2003); State
v. Olivas, 856 P.2d 1076, 1086 (Wash. 1993).

 





[6]  
Article 1 provides that all persons have the right to “certain natural,
inherent, and unalienable rights, amongst which are the enjoying and defending
life and liberty, acquiring, possessing and protecting property, and pursuing
and obtaining happiness and safety.”  Vt. Const. ch.
I, art 1.

 





[7]
“The most common meaning of ‘general warrant’ was a warrant that lacked
specificity as to whom to arrest or where to search; for example, a warrant
directing . . . a search of ‘suspicious places.’ ” T.Y. Davies, Recovering
the Original Fourth Amendment, 98 Mich. L. Rev. 550, 558 n.12 (1999). 
As do many other aspects of our Constitution, Vermont’s Article 11 mirrors a
provision of the Pennsylvania Constitution, adopted a year earlier.  See id.
at 683 (“Like the other state [constitutional] provisions adopted in 1776, the
Pennsylvania provision focused precisely on the right not to have one’s person
or house subjected to general warrant authority.  That was also true of
the 1777 Vermont provision, which copied Pennsylvania’s.”).





[8] 
As was noted at oral argument, felons commonly use aliases and false
identities, and accurate identification of those who employ such gambits will
be furthered by the DNA database.





[9] 
We do not “scoff,” post, ¶ 68, at the
notion that the statute presages authoritarian futures.  Rather,
consistent with our constitutionally limited role, we simply do not speculate
about what the statute “presages” at all.  Instead we consider, based on
the record before us, what the statute actually authorizes the State to do.

 





[10] 
Our dissenting colleague is similarly concerned
with the “significant privacy interests involved,” post, ¶ 58, in the
State’s purported gathering of a “panoply of private genetic information,
including physical and medical characteristics, genealogy, and predisposition
to disease” revealed by DNA, post, ¶ 59.  But this information, to
the extent it could be extracted from a DNA sample, is explicitly not
gathered under the statute we analyze today.  See supra, ¶ 6 and
the statutory provisions cited therein.  Cases like this one “must be
decided on the facts of each case, not by . . . generalizations.”  Dow
Chem. Co. v. United States, 476 U.S. 227, 238 n.5 (1986).  We analyze
the search that is actually authorized by the statute and before us in this
case.  The dissent, in large part, analyzes a search that might
occur if a malicious someone with access to unspecified DNA-analysis technology
violated the plain terms of the statute.  But a potential search,
particularly one that is explicitly prohibited by statute, cannot be the
subject of a case or controversy ripe for decision by this Court, and so a
fortiori cannot violate Article 11.  Cf. United States v. Karo, 468 U.S. 705, 712
(1984) (“[W]e have never held that potential, as opposed to actual, invasions
of privacy constitute searches for purposes of the Fourth Amendment.”). 
The dissent would effectively have us issue an advisory opinion about the constitutionality
of events that simply have not happened.  This we cannot do.  See In
re Opinion of the Justices, 115 Vt. 524, 529, 64 A.2d 169, 172 (1949) (“By
no possible construction of the Constitution of this State can [the judicial]
power be enlarged to include the giving of an opinion upon a question of law
not involved in actual and bona fide litigation brought before the Court in the
course of appropriate procedure.”).





[11] 
The dissent concedes that “convicted criminals
make their identity a public concern by committing a crime, and the government
must have identifying information to administer the criminal justice system,”
but contends that the “extraction, analysis, indefinite storage and repeated
law-enforcement searches” of the DNA samples “seriously undercut[] the
constitutional right of citizens to be free in their persons.”  Post,
¶ 60.  The dissent elides the fact that the feared “analysis” simply
results in a numeric identifier that, on the record before us, reveals nothing
other than the identity of the person from whom a particular sample was
taken.  The primary authority cited for the proposition that more
information might be extracted is a student note that cites no other
authority.  See post, ¶ 62 (citing P. Monteleoni,
Note, DNA Databases, Universality, and the Fourth Amendment, 82 N.Y.U.
L. Rev. 247, 256 (2007)).  The dissent cites the note for the proposition
that DNA profiling “can reveal probabilistic information about one’s ethnicity
and gender,” post, ¶ 62, but omits to mention the footnote following the
quoted language, in which the author concedes that “[i]t
is unlikely that analysis of DNA profiles will ever reveal a great deal of
information, however, considering that a profile represents such a small
percentage of a person’s genetic code.”  Monteleoni,
supra, at 256 n.51.  Further, even if taken as true, the note
states only that the DNA could reveal “probabilistic information about . . .
ethnicity and gender.”  Id. at 256.  Surely the State already
knows both the gender and ethnicity of convicted felons based on more than
“probabilistic information.”  In any event, if the State’s mere knowledge
of a citizen’s ethnicity and gender triggered the warrant requirement, every
request for, for example, a driver’s license would require a warrant, lest the
State inadvertently—and, according to the dissent, unconstitutionally—become
aware of a driver’s gender or ethnicity.





[12] 
As commentators have noted, there has been virtually no scientific analysis of
the overall effectiveness of DNA databases in solving or preventing crimes or
comparison of the databases’ effectiveness to that of other forensic
techniques.  M. Rothstein & M. Talbott, The
Expanding Use of DNA in Law Enforcement: What Role for Privacy?, 34 J.L.
Med. & Ethics 153, 154-55 (2006).   





[13] 
At the federal level, the collection and retention of DNA from arrestees and
non-U.S. persons detained under federal authority is already sanctioned.
 42 U.S.C. § 14135a(a)(1)(A).





[14] 
While I recognize that every appellate court to have considered the
constitutionality of DNA database statutes thus far has upheld them, the issue
is not without controversy in the courts, and the constitutionality of DNA
databases is not a foregone conclusion—particularly under our unique Article 11
jurisprudence—as implied by the majority.  See, e.g., United States v.
Stewart, 468 F. Supp. 2d 261 (D. Mass. 2007) (holding that federal DNA Act
is unconstitutional as applied to probationer); United States v. Sczubelek, 402 F.3d 175, 189 (3d Cir. 2005) (McKee, J.,
dissenting); United States v. Kincade, 379
F.3d 813, 842 (9th Cir. 2004) (Reinhardt, J., dissenting). 





[15]  The United States Supreme Court’s
recent Fourth Amendment decision allowing warrantless,
suspicionless searches of parolees based solely on a
general balancing of interests is inapposite to our own analysis of the DNA
database statute’s constitutionality under Article 11.  In Samson,
the Court relied on the defendant’s status as a person within the corrections
system as justification for its departure from the traditional special needs
analysis.  547 U.S. at 848-49.  As the Samson dissent duly
recognized, this is circular reasoning: a defendant’s status in the corrections
system makes him subject to warrantless searches,
which undermines his reasonable expectation of privacy, which allows the Court
to abandon constitutional protections in favor of a general balancing of
interests, which necessarily results in any government interest outweighing the
parolees’ effectively nonexistent privacy interests.  Id. at
857-58.  Under this regime, the constitutional protections against
unreasonable search and seizure cease to apply to citizens within the
corrections system, whether prisoners, probationers or parolees.

 

The Supreme Court’s abandonment of the special needs
doctrine stands in sharp contrast to our own jurisprudence.  We have never
held that an individual’s status alone can so undermine his right to
constitutional protections that any articulated governmental interest may
justify a warrantless, suspicionless
search of that individual.  As such, I believe the “totality of the
circumstances” test has no place in our Article 11 jurisprudence and reiterate
that only a special need, beyond normal law enforcement needs, can justify warrantless, suspicionless
searches such as those sanctioned by the DNA database statute at issue. 





[16] 
In fact, introduction of the DNA database statute in the Vermont Legislature
was largely motivated by the efforts of the federal government to integrate
state DNA databases with CODIS.  The State forensic lab director at the
time the bill was in committee testified that the State stood to gain $172,000
in federal funding to improve its operations, conditioned on Vermont passing
its own DNA database law.  State DNA Databank: Hearing on H.89 Before House
Judiciary Comm., 1997-1998 Bien. Sess. (Vt. Jan. 22,
1997).

  





[17] 
There are other decisions in which we have overlooked the warrant and probable
cause requirements of Article 11 that are inapposite to our analysis today. 
In State v. Richardson, we upheld a warrantless
search in which a police officer removed a gun in plain view from the
defendant’s car.  158 Vt. 635, 603 A.2d 378 (1992) (mem.). 
The immediate threat of the exposed gun if left unattended was a special need
justifying a departure from Article 11 protections.  Id. at 636,
603 A.2d 379.  Thus, while the Richardson decision is instructive
on the “special need” prong of the Article 11 exception, it differs from the
instant case because the search was based on individualized suspicion of
criminal wrongdoing.  Likewise, we departed from the warrant and
probable-cause analysis in State v. Welch, where we upheld a warrantless inspection of the defendant’s pharmaceutical
prescriptions under the “pervasively regulated industry” exception.  160
Vt. 70, 80-81, 624 A.2d 1105, 1111 (1992).  Although I advocated for a
special needs analysis in my dissenting opinion, the majority reached its
holding based on the regulatory search exception to the warrant rule.  See
id. at 90-91, 624 A.2d at 1116 (Johnson, J., dissenting).  In
addition, the search in Welch was conducted on the basis of
individualized suspicion.  Thus, the Welch analysis is inapplicable
here.  

 

       Prior to Berard, in State v. Record, we upheld DUI roadblocks
conducted under strict guidelines, finding that the government’s interest in
immediately removing intoxicated drivers from the roadway outweighed the
minimal intrusion presented by the roadblock.  150 Vt. 84, 548 A.2d 422
(1988).  While Record is relevant to our current inquiry to the
extent that it involved suspicionless, warrantless searches, it predated the governing special
needs exception and relied on a simple balancing of interests to overcome
Article 11’s individualized suspicion and warrant requirements.  As the
dissent in Record noted, there was an important analytical oversight in
the majority’s analysis of the constitutionality of DUI roadblocks.  Id.
at 97, 548 A.2d at 430 (Hill, J., dissenting).  If Article 11’s
protections could be overcome anytime the governmental interest in a search
outweighed individual privacy interests, the rule requiring a warrant and
probable cause for constitutional reasonableness would be swallowed up by the
exception.  Thus, the Record dissent posited that the threshold
question was “whether a DUI roadblock presents the sort of exceptional
circumstances that . . . justify abandonment of the warrant and probable cause
requirements,” and concluded that it did.  Id.  Only then did
the dissent go on to conduct a balancing of the respective interests of the
government and the individuals subject to the roadblock.  Two years later,
we decided Berard and adopted the dissent’s
reasoning in Record, holding that the State must show “special needs,
beyond the normal need for law enforcement” to overcome Article 11’s probable
cause and warrant requirements.  Berard,
154 Vt. at 311, 576 A.2d at 121.  The Court acknowledged that it had not
previously announced the “special needs” standard, but maintained that
“extraordinary factors” necessitated the search in Record and
retrospectively recognized “[t]he special needs of the state in a DUI
roadblock.”  Id. at 311, 312 n.2, 576 A.2d at 121, 121 n.2.





[18]  Even the defendant conceded that
random searches were necessary for this purpose, but advocated for a warrant to
be issued on something less than probable cause.





[19]
 To be sure, the evil resulting from unlimited discretion accorded to
officers who held general warrants was an additional factor in the adoption of
Article 11, but it is not one that overcomes the principal purpose of Article
11: to protect the right of the people to privacy against government
interference.

 





[20] 
The articulation of “other purposes,” such as the identity of missing persons,
or the exoneration of the innocent, are not sufficiently dominant or supported
to provide the special needs necessary to meet the State’s burden and serve
only as makeweight in the majority opinion.





[21]  Although we adopted the special needs
doctrine from federal case law, our Article 11 special-needs jurisprudence has
since developed differently from the federal Fourth Amendment test,
particularly with respect to prisoners, probationers and others within the
corrections system.  Nevertheless, recent United States Supreme Court
decisions rejecting or upholding the application of special needs, while not
controlling, are instructive on the question of what is a special need. 
The term most certainly does not embrace either society’s general interest in
crime control or the targeting of individuals for prosecution.  Compare City
of Indianapolis v. Edmond, 531 U.S. 32, 41-47 (2000) (invalidating a
roadside checkpoint designed to detect illegal drugs), and Ferguson v. City
of Charleston, 532 U.S. 67, 77-84 (2001) (holding unconstitutional a public
hospital’s forwarding results of non-consensual drug testing of maternity
patients to police—“[i]n none of our previous special
needs cases have we upheld the collection of evidence for criminal law
enforcement purposes”), with Lidster, 540 U.S.
at 427 (upholding checkpoint, but individuals not targeted for prosecution), Bd.
of Educ. v. Earls, 536 U.S. 822, 829 (2002)
(upholding random drug testing of students, but no prosecution allowed), and Nat’l
Treasury Employees Union v. Von Raab, 489 U.S.
656, 663, 677 (1989) (upholding drug testing of urine of customs officials for
positions requiring use of firearms or involving interdiction of illegal drugs,
but official who tested positive could be dismissed but not prosecuted
criminally).  

 





[22] 
The majority, while acknowledging the diminished privacy interests of those
within the corrections system, fails to analyze the spectrum of privacy rights
retained by prisoners, probationers, parolees, and others within the system,
respectively.  By its reasoning, parolees who have already served their
time and are released into free society have no greater privacy interests than
prisoners confined to a cell.  This is in contravention of our
jurisprudence.  See Lockwood, 160 Vt. at 559, 632 A.2d at 663 (stating
that “privacy rights of probationers are arguably greater than those of
inmates”); see also Weikert, 504 F.3d at 12
(acknowledging that “different statuses may diminish an individual’s
expectation of privacy to different degrees”).  





[23] 
The majority takes us to task for our reliance on articles outside of the
record for the proposition that so-called “junk DNA” can reveal private medical
information, when the real problem with this case is that there is nothing
approaching a record on this issue and yet the majority decides the question as
if there were.  It is the majority’s reliance on the State’s mere
assertion that no weighty privacy interest is involved in profiling “junk DNA”
that compels the response that there are contrary views on the issue.